## Charles T. Mason and Others vs. James Hoyle.

Hartford Dist., May T., 1887. Park, C. J., Carpenter, Pardee, Loomis and Beardsley, Js.

The use made by mill-owners of the water of a stream, must in its relation to mill-owners below them on the stream, be a reasonable use.

What is a reasonable use in a particular case is essentially a question of fact.

The use must be adapted to the capacity of the stream.

In determining its capacity, its condition throughout the year is to be considered. Where there is an ample supply for nine months and a scar-

Mason v. Hoyle.

city for three, this scarcity, if it occurs so regularly that it can be anticipated, is to be treated as a fixed quantity in the estimate and as so far reducing the capacity of the stream.

A reasonable use must permit the water to flow in its accustomed way, so far as it can be done and a beneficial use, though a limited one, be made of the reduced stream.

The capacity of the reservoir of the upper mill does not determine its right to the detention of the water, nor the capacity of the mill.

It is for the public interest that water power be used, so far as it can be. The majority of mill-owners are small ones. They should be protected against such a use of the streams by mills disproportioned to their capacities as would practically deprive them of water and ruin their privileges.

The defendant had a large mill upon a stream in which there was an ample supply of water for nine months of the year, but regularly for three months a great scarcity, and had a large reservoir which, in the dry season, it required the flow of several days to fill. When it was full he was accustomed to let the water run for a few hours until it was emptied. The plaintiffs were owners of smaller mills below, with small mill ponds. The waters when discharged by the defendant in large part ran to waste over the dams of the plaintiffs. The defendant's predecessors in the ownership of his mill and in the same business, had been accustomed to so use the water as to get the benefit of it and yet do no injury to the owners below. Held that the defendant's use of the water, in its relation to the owners below, was not a reasonable one.

The defendant used steam power in his mill during the dry season, and was able to make such use of the water in connection with it as would not be injurious to the plaintiffs and yet reasonably advantageous to himself. Held that, while his right to the water was not affected by his possession of steam power, yet the fact that he had and was using such power and could thus save himself from any serious inconvenience was proper to be considered in determining whether he should be restrained from making the injurious use of it which he was making.

(Two judges dissenting.)

[Argued May 3d, 1887—decided June 26th, 1888.]

SUIT for an injunction against the unlawful detention of the waters of a stream, by the defendant, the owner of an upper mill, to the injury of the plaintiffs, the owners of lower mills on the stream; brought to the Superior Court in Tolland County. The following finding of facts was made by the court.

The plaintiffs, at the commencement of the suit, and for many years before, were and had been severally the owners

and occupiers of lands, mills and mill privileges, situated on a stream of water called Fenton River in the town of Mansfield. The plaintiff Mason during all that time has owned and operated a saw mill, grist mill and wagon shop, with machinery driven wholly by water power, under a head and fall of about eight feet, supplied from a small pond owned by him, covering not over an acre and a half, and raised by a dam across the bed of the stream. About eighteen inches only upon the top of this pond, when full, is available for power. When the flow of water into the pond is scant, but adequate for the purpose, the ordinary practice at this mill has been to run the machinery until the pond is drawn down some six or eight inches from the top, and then cease running till it fills again, when the use is resumed as before. This privilege is an ancient one.

The mill and privilege of the plaintiff Smith is on the same stream, at a considerable distance below that of Mason, and is and has long been used for the manufacture of silk, by means of machinery driven by water power alone, under a head and fall of seven feet, supplied from a small pond over the bed of the stream, which has capacity to run the machinery only a few hours without supply from the stream above.

The mill and privilege of the plaintiff Williams is situated only a few rods below that of Smith on the same stream, and is also used for the manufacture of silk. The machinery is driven by water power only, under a head and fall of six and a half feet, supplied by a pond over the bed of the stream covering less than an acre. A regular supply of water from the stream above is indispensable for the successful conduct of the business. This privilege is so situated that a larger pond or reservoir would not be possible.

It would be possible for the other plaintiffs to build larger dams and make new reservoirs to store the surplus water for use in times of drouth, but the expense of doing so would make it of doubtful expediency as an investment. All these privileges depend wholly upon Fenton River for power. The machinery and business at each is and has been such that

the ordinary flow of the stream, during the dry seasons of the year, as they ordinarily occur, would (except for the acts of the defendant mentioned hereafter) have been ample to continue the business and meet its ordinary demands.

The defendant Hoyle, since the year 1875, has been owner and possessor of land, mills and mill privilege, in the town of Willington, on the same stream, next above the mill of the plaintiff Mason and about four hundred and fifty rods therefrom, which are and long have been used for the manufacture of woolen goods. The privilege consists of a head and fall of twenty feet, the water being drawn on to the wheel directly from a small pond near the mills, which is supplied by means of a canal or ditch connecting with a larger pond or reservoir, owned by him, about a quarter of a mile above on the same stream, where there is an additional fall, when the reservoir is full, of about eleven feet, and some five acres are covered with the water. The dam at the reservoir was repaired and enlarged by the defendant about the year 1881.

In addition to water power the defendant has at his mills a steam boiler and engine capable of driving his machinery independently of the water wheel, but it is so arranged that it may be used with facility and without detriment to the business in connection with the water power.

As a usual thing, for eight or nine months of each year, extending from September or October to May or June following, there has been flowing in the river an ample supply of water for all the privileges and mills thereon, and during such periods there has been no complaint or ground of complaint against the defendant or any other mill owner as to the mode of using the water, but during the remaining three or four months, between May and October (subject to a few exceptions in extraordinary seasons) the supply of water has been comparatively very small. And during such dry seasons the amount of machinery to be driven at the defendant's mill has been and is greatly disproportionate to the diminished capacity of the stream; and it has been impossible for the defendant, at such times, to run all his machinery

by water power alone, except for a small fraction of the time.

The mill and privilege now owned by the defendant was owned and occupied by other parties for the same purposes, many years before the defendant obtained the same.

These prior owners and occupants, during the season of deficient supply of water, as a general rule used steam and water power in connection, and in this way the water naturally flowing in the stream was allowed to pass regularly to the several privileges of the plaintiffs, furnishing a supply sufficient to meet the ordinary demands of their business ; so that no complaint was made by them or either of them. But about the year 1881 the defendant adopted a practice in this respect different from that of his predecessors, and during the season of the year when the water supply has been inadequate for his use he has been in the habit of shutting his gates, wholly or partially, so that the water would accumulate in his reservoir, meanwhile running his machinery wholly by steam power, from two to five days, until there was an accumulation of water in his reservoir sufficient to run by water power alone continuously for five or six hours, and after so running he would return again to the exclusive use of steam and continue as before the alternative use of steam and water power.

By these means the defendant has detained, for periods varying from two to five days in the week and for many weeks during the dry season of each year, substantially all the natural flow of the stream, except so much as he required daily for washing wool and cloth and for his boiler, (which usually has been much less than the natural flow of the stream,) and then by the use of water power alone for periods of five or six hours a day, once or twice during the week, and sometimes oftener, the water has flowed from his wheel in quantities far in excess of the natural flow of the stream during such seasons, which has resulted in quickly filling the small ponds of the plaintiffs and then running to waste over their several dams. The defendant however has not let down at such times more water than was required to

run all his own machinery. In this way each of the plaintiffs has suffered great inconvenience, damage and loss.

The defendant in this matter has not acted maliciously, but from a belief that he had a lawful right to make such use of the water. The plaintiffs have repeatedly informed him of their annoyance and injuries and remonstrated against his mode of using the water.

There are several small water privileges on the same stream above the defendant's mills, and some below the plaintiffs', and as to these the court finds that for many years it has been and still is the usual practice of each of the proprietors, (including also the plaintiffs,) whenever the head of water in their several ponds has been insufficient to enable them to run their machinery to advantage, to shut the gates of their ponds and hold back the natural flow until there had accumulated a sufficient supply for effective use, and in no case except that of the defendant was there any evidence of resulting damage; and in relation to this practice the court further finds that, owing to the small capacity of the ponds, or condition of the dams, or other circumstances, there has never been in any of these cases any long continued detention of the natural flow of the stream. And on the other hand, owing to the small amount of machinery to be driven when the use of the water power has been resumed, in no case has there been precipitated upon the mill owners below any such unusual quantity as to cause it to run to waste or occasion in any way loss or inconvenience, as in the case of the defendant.

Upon these facts the case was reserved for the advice of this court.

*B. H. Bill* and *J. M. Hall*, for the plaintiffs, cited—Angell on Watercourses, § 94; Gould on Waters, § 218; Wood on Nuisances, § 416; 3 Kent's Com., 440; Washb. on Easements, 348, 352, 357; *Ingraham* v. *Hutchinson*, 2 Conn., 584; *King* v. *Tiffany*, 9 id., 166; *Twiss* v. *Baldwin*, id., 291; *Wadsworth* v. *Tillotson*, 15 id., 373; *Parker* v. *Griswold*, 17 id., 287; *Parker* v. *Hotchkiss*, 25 id., 321; *Keeney*

Mason *v.* Hoyle.

*& Wood Manf. Co.* v. *Union Manf. Co.*, 39 id., 583; *Harding* v. *Stamford Water Co.*, 41 id., 92; *Bealy* v. *Shaw*, 6 East, 208; *Williams* v. *Morland*, 2 Barn. & Cress., 910; *Barrett* v. *Parsons*, 10 Cush., 367; *Thurber* v. *Martin*, 2 Gray, 395; *Tourtellot* v. *Phelps*, 4 id., 376; *Brace* v. *Allen*, 10 Allen, 447; *Gleason* v. *Assabet Manf. Co.*, 101 Mass., 72; *Hinckley* v. *Nickerson*, 117 id., 215; *Platt* v. *Johnson*, 15 Johns., 213, 218; *Merritt* v. *Brinkerhoff*, 17 id., 321; *Clinton* v. *Myers*, 46 N. York, 511, 521; *Wheatley* v. *Chrisman*, 24 Penn. St., 298; *Patten* v. *Marden*, 14 Wis., 473; *Blanchard* v. *Baker*, 8 Greenl., 253, 266; *Phillips* v. *Sherman*, 64 Maine, 171; *Tyler* v. *Wilkinson*, 4 Mason, 397; *Webb* v. *Portland Mfg. Co.*, 3 Sumn., 189.

*J. L. Hunter*, for the defendant, cited—2 Black. Com., 38; Angell on Watercourses, § 116; Washb. on Easements, 216, 266, 272; Gould on Waters, § 218; Wood on Nuisances, § 371; *Palmer* v. *Mulligan*, 3 Caines, 307; *Platt* v. *Johnson*, 15 Johns., 213; *Merritt* v. *Brinkerhoff*, 17 id., 306; *Van Hoesen* v. *Coventry*, 10 Barb., 518; *Clinton* v. *Myers*, 46 N. York, 511, 518; *Bullard* v. *Saratoga Victory Mfg. Co.*, 13 Hun, 43: *Pollitt* v. *Long*, 3 N. Y. Supreme Ct., 232; *Hoy* v. *Sterrett*, 2 Watts, 327; *Hetrick* v. *Deachler*, 6 Penn. St., 32; *Hartzall* v. *Sill*, 12 id., 248; *Wheatley* v. *Chrisman*, 24 id., 298; *Whaler* v. *Ahl*, 29 id., 98; *Mabie* v. *Matterson*, 17 Wis., 1; *Timm* v. *Bear*, 29 id., 254; *Pool* v. *Lewis*, 41 Geo., 182; *Davis* v. *Getchell*, 50 Maine, 602; *Phillips* v. *Sherman*, 64 id., 171; *Snow* v. *Parsons*, 28 Verm., 459; *Jacobs* v. *Allard*, 42 id., 303; *Canfield* v. *Andrew*, 54 id., 1; *Barrett* v. *Parsons*, 10 Cush., 367; *Pitts* v. *Lancaster Mills*, 13 Met., 156; *Thurber* v. *Martin*, 2 Gray, 394; *Haskins* v. *Haskins*, 9 id., 390; *Gould* v. *Boston Duck Co.*, 13 id., 442; *Drake* v. *Hamilton Woolen Co.*, 99 Mass., 574; *Parker* v. *Hotchkiss*, 25 Conn., 321; *Keeney & Wood Mfg. Co.* v. *Union Mfg. Co.*, 39 id., 576.

LOOMIS, J. The rule that now obtains in all jurisdictions, as recognized by all the authorities, is that the use made by

mill-owners of a stream, must in its relation to other mill-owners on the same stream, be a reasonable use. The rule is obviously one that applies solely to the relation of the several occupants of the stream among themselves. Where one mill-owner is the sole occupant there is in law no limitation upon his use. The rule being that of reasonable use, the application of the rule becomes a matter for each particular case. The question, while in some sense a mixed question of law and fact, is yet essentially a question of fact. Whether the use be reasonable must depend less upon any general rule than upon the particular circumstances. But there are certain conditions essential to a reasonable use, so long recognized by common consent or so obviously just that we may safely generalize with regard to them. *Snow* v. *Parsons*, 28 Verm., 459.

In the first place, the use must be as near as possible an equal use, or rather an equal opportunity to use. "Equity delighteth in equality." Every owner improving a mill privilege has a right to consider the law as protecting him against any unfair use by any other owner who may establish a mill above him. The term "unfair use," is the equivalent of "unreasonable use." When the owner above him has established his mill he is bound not merely by this obvious rule of the stream, but by another more general rule of universal application, that no one may so use his own as to injure the property of another. This golden rule of the law is not of course to be taken literally for, where there is a concurrent use of water and at the same time a deficiency, the use of one will to some extent injure another.

In the next place, a reasonable use is one adapted to the character and capacity of the stream. Indeed there is no other factor of so much importance that comes into the question as that of the capacity of the stream, and in determining this capacity its condition throughout the year is to be considered. If, for instance, there is an ample supply of water for nine months of the year and a scarcity for three, this scarcity, if it occurs so regularly that it can be anticipated, is to be treated as a fixed quantity in the estimate and

as so far reducing the capacity of the stream. We will discuss this point more fully in another connection.

In the next place, a reasonable use must permit the water to flow in its accustomed way, so far as this can be done and a beneficial use, though a limited one, be made of the reduced stream, each riparian mill-owner having his fair proportion.

It is the right of every mill-owner, large or small, on the stream, that the water be allowed to run in its usual way except where detained by another to secure his fair proportion of beneficial use. A policy of the state may come in to affect the question.

It is for the public interest that all our streams be improved as far as they can be. This rule has sometimes been applied to favor the larger mill-owner, but it should have regard also to small mill-owners, who are the great majority of those in such business or who incline to go into it. These men of moderate capital investing their means in mills upon our lesser streams, should be protected against such a use of the streams by mills disproportioned to their capacities as would practically deprive them of water and ruin their privileges. And where the water is sufficient only for a few hours use in a day it is a reasonable demand of these lesser mills that they should be allowed water enough to run a part of every day rather than it should be detained by any larger mill in such a way as to compel them to crowd into a single day or night all the work of a week. There would be no way in which the lesser mills could hold their own against the disproportionately large ones, with reservoirs of great capacity, but to enlarge their own reservoirs and ponds to an equal capacity, thus compelling all to enlarge their works in a manner not demanded by the capacity of the stream, and involving an unnecessary and perhaps ruinous expenditure.

If a large mill-owner has made a reservoir which it requires several days to fill in the dry season, he has no more right on that account to detain the water for a week to fill it than he would have to detain it a month. His rights are

not measured at all by the capacity of his reservoir, for he may be able to double or fourfold its capacity, and the law will not allow him to establish for himself the rule that shall decide his rights between himself and another. The question is, not as to the capacity of the reservoir, but what is a fair use of the water between him and his neighbor below. Where the reservoir, as in the case at bar, is simply to store the water and not to furnish the head and fall, he can as well use the water when it is a half or a quarter filled as the lower owner can use it when his smaller pond is wholly filled. A reservoir used to store surplus water, when the supply is abundant, for use at a time when it is deficient, is a great benefit to all the lower proprietors, but if used to detain the water in the dry season it may occasion great injury, as in this case.

These principles seem in the highest degree reasonable and just. In their application the particular circumstances of each case must determine the result. What may be a reasonable use in one case may be an unreasonable one in another, even where the general facts are similar. The question is so largely one of fact that, like decisions in the case of wills, one decision can rarely afford a decisive guide for another; but we believe that most of the principles we have laid down accord well with the best considered cases. A seeming conflict is often occasioned by applying some general principle to the case in hand, without stating the implied qualifications necessary to adapt it to other cases. For instance, in many cases we find the general proposition, upon which the defendant in this case relies, that the upper mill proprietor may detain the water in times of drouth until he can advantageously and profitably use it to propel his machinery. The leading case in Pennsylvania of *Hoy* v. *Sterrett*, 2 Watts, 327, adopted in substance this proposition, which was afterwards, in *Whaler* v. *Ahl*, 29 Penn. St., 98, applied in a way to indicate that the test as to the extent of the detention of water by the upper proprietor was its usefulness to himself, without regard to his machinery or the size of the stream with reference to the entire use demanded

by all the other mills on the stream; but this proposition without the suggested qualifications has not been accepted elsewhere. While it is true that a right to use implies a right to detain, yet the word "reasonable" must qualify both the use and the detention. Nothing can be more unjust and unsafe than to limit one man's rights by the selfish convenience or business of another.

Our criticism of the Pennsylvania decisions ought in justice to be qualified by the further statement that the courts of that state have adhered more rigidly and consistently than those of most other states to the rule that the question of the reasonableness of the use of water was exclusively for the jury. In *Hetrich* v. *Deachler*, 6 Penn. St., 32, a detention on the part of the upper proprietor of three, four and five days, and in a single instance of thirteen days, followed upon resuming business by such an abundance of water let down as injured the plaintiff almost as much as the previous detention, was approved, but the Supreme Court, after approving the charge leaving it to the jury to say whether the detention was longer than was necessary for the defendant's proper enjoyment of the water at his mill, simply say that "the reasonableness of the detention, depending as it must on the nature and size of the stream, as well as the business to which it is subservient, and the ever-varying circumstances of each particular case, must necessarily be determined by the jury." This does not seem to be objectionable, and it involves an important qualification of the principle as stated in the previous case of *Hoy* v. *Sterrett*.

But whatever view may be taken of the cases in Pennsylvania, elsewhere there is scarcely any disagreement among the authorities. The doctrine held by the courts in all the New England states is well stated in the charge of the judge in the case of *Thurber* v. *Martin*, 2 Gray, 395, which was as follows: "Every riparian proprietor has a right to use the water of a river or running stream for the purpose of working, operating and propelling artificial works erected upon its banks. Priority of occupation secures to the first occupant the exclusive right to the use of the water to the ex-

tent of his occupation; * * * *but his right is limited* to using the water in a reasonable and proper manner for the propelling, working and operating of a mill of such magnitude only as is adapted and appropriate to the size and capacity of the stream and quantity of water flowing therein; he cannot lawfully detain the water in his pond an unreasonable length of time, nor discharge it therefrom in such quantities that it will run to waste and be lost by the riparian proprietors below; but he is bound to use the water in such way and manner that every riparian proprietor, at points further down the stream, will have the enjoyment and use of it substantially according to its natural flow; but still subject to such disturbance and interruption as is necessary and unavoidable in and by the reasonable and proper use of it for the propelling, working and operating of a mill of suitable magnitude, adapted and appropriate to the size and capacity of the stream and the quantity of water flowing therein; and if it appear from all the evidence in the case that the defendant's mill is not adapted and appropriate to the size and capacity of the stream, and is disproportionately large and extensive, or if the defendant used the water in an unreasonable manner, and the plaintiff was in either of these ways, or by either of these means, interrupted or disturbed in the operation of his mill, he is entitled to a verdict commensurate to the injury sustained."

SHAW, C. J., in commenting upon this charge, says:— "The court are of the opinion that the law was rightly stated by the judge at the trial; that it was laid down with fullness and accuracy and with proper qualifications. Every man has a right to the reasonable use and enjoyment of a current of running water, as it flows through or along his own land, for mill purposes, having a due regard to the like reasonable use of the stream by all other proprietors above and below him."

A similar doctrine obtains in the state of New York, as laid down in *Merritt* v. *Brinkerhoff*, 17 Johns. R., 321. The court in that case lays down the law as follows:—"The common use of the water of a stream, by persons having

mills above, is frequently, if not generally, attended with
damage and loss to the mills below; but that is an incident
to that common use and for the most part unavoidable. If
the injury is trivial, the law will not afford redress, because
every person who builds a mill does it subject to this contin-
gency.    The person owning an upper mill in the same stream
has a lawful right to use the water, and may apply it in
order to work his mills to the best advantage, subject how-
ever to *this limitation,* that if in the exercise of this right,
and in consequence of it, the mills lower down the stream
are rendered useless and unproductive, the law in that case
will interpose and limit this common right, so that the own-
ers of the lower mills shall enjoy a fair participation; and if
thereby the owners of the upper mill sustain a partial loss
of business and profits, they cannot justly complain, for this
rule requires of them no more than to conform to the princi-
ple upon which their right is founded. It cannot, then, be
admitted that the defendants may use the water as they
please because they have a right to a common use, although
their works may require all the water in order to derive the
greatest profit.    The plaintiffs' rights must be regarded;
they must participate in the benefit of the stream to a reason-
able extent, although the defendant's profits may be thereby
lessened.    If the defendant insists on the unrestricted use of
the water, and appropriates it accordingly, and this proves
destructive to the mills below, the law in that case allows
the party injured compensation or damages."

The cases decided by this court of *Twiss* v. *Baldwin*, 9
Conn., 291, decided in 1832, *Wadsworth* v. *Tillotson*, 15 Conn.,
373, decided in 1843, *Parker* v. *Hotchkiss*, 25 Conn., 330,
decided in 1856, *Agawam Canal Co.* y. *Edwards*, 36 Conn.,
497, decided in 1870, and *Keeney & Wood Mfg. Co.* v. *Union
Mfg. Co.*, 39 Conn., 581, decided in 1873, as far as they go
accord well with the principles laid down in the cases cited
from Massachusetts and New York, only there is perhaps
this difference, that in some of the cases before the last one
(see *Agawam Canal Co.* v. *Edwards* and *Twiss* v. *Baldwin*)

the principles adopted would seem to be still more favorable to the rights of the lower mill proprietor.

But the general principle stated by us at the outset of the discussion, to the effect that to justify a detention of the water by the upper proprietor long enough to make an advantageous use of it, his machinery, or so much of it as he operates, must be adapted to the fixed character of the stream (if it has any) as to deficiency of water during the dry seasons, apparently conflicts with the rule laid down in many cases, that the adaptation referred to must be to the usual quantity of water in the stream, or other equivalent expressions, by which we have no doubt was meant, as applicable to those cases, the medium average flow between a high and low stage of water. But in none of the cases where the rule has been applied, so far as we have examined them, did the seasons of great scarcity of water occur with such regularity year after year as in the case at bar; hence there was nothing to require the mill-owner to take notice of anything more than the average flow.

The case most relied upon by the defendant under this head seems to be *Gould* v. *Boston Duck Co.*, 13 ·Gray, 442, which was, as here, an action by a lower mill-owner against an upper owner for detaining and using the water to the injury of the plaintiff's mill. The facts were found and reported to the court by arbitrators, who found that the defendants' works "were of such magnitude only as were adapted and appropriate to the size and capacity of the stream and to the quantity of water usually flowing therein. But in our judgment, as to the adaptation and suitableness of said works to the stream, we have had reference to the ordinary volume and flow of water at different seasons; but no reference to the plaintiff's necessities or demand for water in such periods of extraordinary and extreme drouth as *occasionally occur* on this stream, when the water, though sufficient to operate the plaintiff's mills, would be insufficient to operate the defendants' factory." The controversy related to the defendants' use of the water during a period of seven years, or parts of years, from 1851 to 1857 inclusive.

Mason *v.* Hoyle.

It was also found that "during the season of greatest drouth in the years of 1851, 1852, 1853 and 1854, the defendants were not able to operate their factory throughout the usual working hours of each working day, but were obliged, in order to create the requisite head and supply of water for their own works, to shut their gates earlier than usual on some days, and sometimes for a whole day at once; but this was not done wantonly, but with a reasonable regard to the best interests and advantage of the defendants as proprietors of said factory and in conformity with the general usage of mills on this and other similiar streams." It was also found that the plaintiff's mills required less than half the water necessary for the defendants' mill, and that in each dry season as well as at other times the defendants discharged double the quantity of water necessary for the plaintiff's mills, which flowed over the plaintiff's dam. And it was further found that "the number of working hours lost to the plaintiff by thus shutting the defendants' gates in order to replenish their pond, would, during the period sued for, namely, from the 1st of June, 1851, to February, 1857, in the aggregate amount to an average of eight and a half days in each of the years 1851, 1852, 1853 and 1854, while in the years 1855, 1856 and 1857 it did not appear that there was any loss of working time or hindrance to the plaintiff's mills or to the defendants' factory from drouth or any cause imputable to the defendants; and we further find that the above proportion of working time lost is less than the time usually lost each year by similiar mills from drouth."

There are several grounds of distinction between this case and the one at bar which are suggestive and important, but in this connection our object is simply to show from the reported facts that the case did not and could not involve the point suggested. The seasons of scarcity of water did not occur with any regularity, so as to give a fixed character to the stream. In three out of seven of the seasons in question there was no scarcity at all, and in the other four it was very insignificant, and the arbitrators speak of those seasons

of extreme drouth when the water would be insufficient to operate the defendants' mill as only *occasional.*

In this case the decision that the defendants did not exceed their just right in the use of the water was obviously just. The defendants could have had no other standard for the adaptation of their machinery than the average flow of the stream. But in the case at bar the finding is that "as a usual thing, for eight or nine months of each year, extending from September or October to May or June following, there has been flowing in the river an ample supply of water for all the privileges and mills thereon, and during such periods there has been no complaint or ground of complaint against the defendant or any other mill-owner as to the mode of using the water; but during the remaining three or four months, between May and October (subject to a few exceptions in *extraordinary* seasons) the supply of water has been comparatively small. And during such dry seasons the amount of machinery to be driven at the defendant's mill has been, and is, greatly disproportionate to the diminished capacity of the stream; and it has been impossible for the defendant at such times to run all his machinery by water power alone, except for a small fraction of the time." And the other fact found, that five days' detention of the water has enabled the defendant to run only five hours, shows still more forcibly the enormous disproportion of his machinery to the capacity of the stream during the dry season.

Now, may we not advance a step and adopt the principle that if seasons of great scarcity of water occur so regularly and continue so long as to fix the character of the stream in that regard, the upper proprietor must adapt the running of his machinery to that condition? We are not able to find any adjudicated case where the principle has been thus announced, but it seems to us in the highest degree reasonable, and it receives strong confirmation from what so distinguished a jurist as Chief Justice REDFIELD says in his note to the case of *Keeney & Wood Mfg. Co.* v. *Union Mfg. Co., supra,* as found in the American Law Register for 1874, (Vol. 13, New Series, page 92,) as follows:—"No doubt

Mason v. Hoyle.

every mill-owner upon a stream, where there is reason to expect a deficiency of water at times, is bound to construct his machinery with reference to such occasional emergencies. But this rule will not apply to extraordinary deficiences, such as no one could reasonably have anticipated."

It would seem impossible to find any other intelligent basis for the required adaptation of machinery to the stream, than what may reasonably be anticipated through the year. If periods of scarcity are uncertain as to their occurrence or as to time and extent, it is fair to look to the average flow, for there is indeed no other basis for calculation, but in cases where there exists a more certain basis it is a strange doctrine that it may be disregarded. The reasoning of the court however in *Drape* v. *Hamilton Woolen Co.*, 99 Mass., 574, suggests the point that the rule to be adopted should be one to promote the largest possible utilization of water power, which can only be accomplished by conceding to the mill-owner the right to erect machinery requiring the full average flow of the stream, with the incidental right to detain the water as may be necessary during the dry season, as otherwise the workmen must remain idle till the wet season returns and the scarcity is over. We find no fault with this rule applied to cases where the season of scarcity cannot be anticipated, but the reason of the rule makes it inapplicable to the case at bar, where it is manifest from the finding that if water power alone was used the workmen could be employed only a small fraction of the time during the summer months; so if we concede to the defendant the right to detain the water as claimed for the propulsion of his entire machinery, the certain result would be that there could be no beneficial employment for men and machinery at the defendant's own mill nor at the several mills of the plaintiffs. There can be no public policy in a rule thus applied. Now the defendant insists that any reasoning which is to determine his water rights must leave out of the account the fact that he has steam power which he can use with facility and without detriment, and this position we accept as substantially correct. At the same time the fact that steam power

must be used or the mill must stop, and that it always has been used, is a significant admission that his machinery has overburdened the water power. It is found that his predecessors in the ownership of the mill, and who were carrying on the same business, so used the water in connection with their steam power as not to injure the plaintiffs in the use of their mills. While the defendant has of course lost no rights to the water by the possession of steam power, yet the fact that he is using such power and can by using the water in connection with it get a reasonably advantageous use of the latter without injury to the owners below, making his present mode of using it unnecessary, is a matter proper to be considered in determining whether he should be restrained from such injurious use.

If the principle we have been contending for is not sufficiently established to be accepted as controlling this case, still, the fact of a regularly recurring deficiency of water is at least one important element in determining the question of reasonable use. The defendant knew the fact when he bought the property, and afterwards when, in 1881, he repaired and enlarged his reservoir, and when, with presumptive knowledge of the result to the plaintiffs, he changed the long established mode of running the mill.

And this suggests another element with which to test the reasonableness of the defendant's use of the water. The immemorial local custom upon the stream, down to the time of the defendant's interposition, to let the water flow to the plaintiffs' mills without any long or injurious detention, according to the authorities in this and other jurisdictions has an important bearing upon the question.

Again, there is still another element of great significance as it exists in this case, namely, the extent of benefit to the defendant by his detention as compared with the injury to the plaintiffs. This principle is stated in *Hayes* v. *Waldron*, 44 N. Hamp., 580; *Union Mills* v. *Ferris*, 2 Saw., 196. It would seem impossible to find a parallel to the case at bar in the difference found to exist between the benefit to the defendant and the damage to the plaintiffs. If we take

the period of greatest detention, which has often occurred, we find that the three mills belonging severally to the three plaintiffs must each be idle five days to enable the defendant to enjoy the slight benefit of a five hours' use.

This discussion, already too protracted, may suffice to show that to accede to the defendant's claim as to the use of the stream would be to enable him to violate most, if not all, the conditions of reasonable use to which we have referred, and practically to absorb the entire beneficial use of the water during the seasons of scarcity.

We advise the Superior Court that the defendant upon the facts found has unreasonably detained the water of the stream in question, and that judgment should be rendered against him in favor of the plaintiffs.

In this opinion PARK, C. J., and BEARDSLEY, J., concurred.

PARDEE, J. I am not able to concur in the foregoing determination.

The water wheel of one of the plaintiffs is driven by water from a pond covering an acre and a half, which can be drawn down eighteen inches; it is his custom when water is scant to draw it down six or eight inches, and then shut his gate and allow the pond to fill. The wheel of another plaintiff is driven by water from a small pond, but only for a few hours without supply from ponds above. The wheel of the third plaintiff is driven by water from a pond covering less than an acre.

The finding is "that the machinery and business at each is and has been such that the ordinary flow of the stream during the dry seasons of the year, as they ordinarily occur, would (except for the acts of the defendant mentioned hereafter) have been ample to continue the business and meet its ordinary demands." Indeed, upon the finding, the plaintiffs did not use one fourth of the ordinary flow during nine months of the year.

The wheel and machinery of the defendant are adapted

to the stream in its ordinary flow during eight or nine months of the year; during the remaining three or four months the flow is comparatively small. During this latter period his machinery is greatly disproportionate to the supply.

The finding proceeds as follows :—"The defendant has detained for periods varying from two to five days in the week and for many weeks during the dry season of each year, substantially all the natural flow of the stream, except so much as he required daily for washing wool and cloth and for his boiler, (which usually has been much less than the natural flow of the stream,) and then by the use of water power alone for periods of five or six hours a day, once or twice during the week, and sometimes oftener, the water has flowed from his wheel in quantities far in excess of the natural flow of the stream during such seasons, which has resulted in quickly filling the small ponds of the plaintiffs and then running to waste over their several dams. The defendant, however, has not let down at such times more water than was required to run all his own machinery. In this way each of the plaintiffs has suffered great inconvenience, damage and loss. The defendant in this matter has not acted maliciously, but from a firm belief that he had a lawful right to make such use of the water. The plaintiffs have repeatedly informed him of their annoyance and injuries and remonstrated against his mode of using the water."

That is, the stream in the drought shrinks to so small a thread that the detention of the whole of it during five days will accumulate only sufficient water to operate the defendant's mill six hours, and yet the flow, during the drought as it ordinarily occurs, is ample to continue the business and meet the ordinary demands of the plaintiffs.

The power of a running stream is valuable property ; it is the source of large profits to the owners, and therefore is beneficial to the state. When courts have been required to adjust controversies between mill-owners as to the time, manner, and degree of use of the common element in seasons of drought, they have endeavored to establish a rule which will secure the fullest possible use of the stream for

the longest time; to exhaust its capacity for creating wealth, as they would endeavor to make it possible for some one to raise all of the ore from a mine.

The flow during nine months of the year is to stand for the stream; the diminished flow of three months is the exception. The rule of law which permits the mill-owner to adapt his machinery to the power of the stream and encourages him so to build as to compel it to do the greatest possible amount of work during the longest time and therefore make the largest possible additions to the wealth of the country, has reference to this long period of fullness.

Of course this case is to stand as if the owner whose needs are the least had been sole plaintiff; and his contentention is, in effect, that no owner shall be permitted so to build as to need more than himself; that during eight or nine months of the year the largest portion of the water shall pass unused by anybody in order that his small wheel may have some on every day of the summer's drought.

In establishing principles which are to govern in such matters courts are required to make them of as wide application as is possible. Upon every stream the proportion of ownership as between large and small proprietors may be and usually is a varying quantity. No rule of law can find a resting place upon it. Therefore, without inquiry in any case whether most proprietors are large or small, the courts have said in reference to every stream, that an owner may adapt his machinery to its fullest capacity when in ordinary flow, and may so long detain the water in times of drought as that he may even then have some profitable use thereof.

The plaintiffs and defendant were each lawfully upon the stream, with equal rights when it is in the condition of ordinary flow. In time of drought it is so small, and the disparity between the needs of the parties is so great, that the lost time cannot be equally apportioned. In this state of things that proprietor whose mill is adapted to the best and fullest use of the stream during the entire period of ordinary flow of nine months, is preferred in the eye of the law over one whose mill allows a large portion of the water to

run past unused during the same period. To the former is permitted such right of detention that he can have some profitable use even during drought—in this case six hours in each week. The plaintiffs can use their mills during every hour of use by the defendant, but if they are permitted to have the water so come to them that they can have some use on every day he can have no use on any day.

The defendant by his utmost detention only accumulated sufficient water for use during six hours in the week. Of course such use must be of little value to either proprietor; but upon the finding it is the most that either can have, if all have something; and there is no finding that the detention and use were in fact unreasonable. I am unable to say that they were as a matter of law. The misfortune of the plaintiffs results from the fact that they are upon a stream of little value to any one in a time of drought; that there is another proprietor upon it; and that the law, in its inability to be impartial, gives the preference to the most beneficial use.

The question is as to division of the use of water when drought prevails to such a degree that there is not enough for either party; therefore there is no opportunity for the application of the rule which requires every person so to exercise his rights as not to injure those of another. Loss of time is inevitable. The only question is as to the apportionment of that loss.

That they have so built that they cannot have the best use of the stream during nine months, is not a reason for permitting them to deprive another of all use during three months.

The plaintiffs can take nothing by any suggestion as to the custom upon this stream. For the finding is that the custom has been for each proprietor to shut his gate and detain water sufficient for profitable use.

The fact that the defendant owns a steam engine does not diminish his right to the use of water.

The principle which I have mentioned has, I believe, the unanimous support of courts and text-writers, where they

Mason v. Hoyle.

are considering the rule which is to govern the use of water by several proprietors where, by reason of drought, there is not enough for full use by any one. In such cases, there being mills of differing capacities, some must of necessity be longer idle than others. The resulting law is that a mill which can use the whole stream in its ordinary flow during nine months may have some use during the three months of drought, even if such use imposes some idleness upon a mill which allows the largest portion of the water to pass unused during the longer period.

I cite a few of the decisions. They are from states covering wide territory, and apply to streams which are subject to drought in time and degree precisely the same as the one under consideration.

In *Drake* v. *Hamilton Woolen Co.*, 99 Mass., 574, it is said:—"The rights of riparian proprietors to vary the natural flow of a stream in order to use it most advantageously for the working of mills, was thoroughly considered in the case of *Gould* v. *Boston Duck Co.*, 13 Gray, 442. * * * It was held that a riparian proprietor might disturb and vary the natural flow of a stream for driving machinery, notwithstanding its injurious effect upon an ancient mill below him. The right is founded upon the consideration that water power is property of great value, and that a large part of the power must run to waste if mills may not be constructed sufficiently large to use all the power of the stream at its ordinary height; and if mills of such a character may be constructed, it is but reasonable that the proprietor should have a right to husband the power in seasons of extraordinary drought, so that he may use it most advantageously, and not be compelled to let his machinery and workmen remain entirely idle till the stream may be raised by rains. It is a reasonable use of his right with reference to the proprietors below him. * * * This interpretation of the rights of riparian proprietors tends to promote the interests of the public, because it enables the owners of water power, which has proved to be a species of property of great value to the public, to avail themselves of it to the utmost extent that

can be deemed reasonable. * * * The proprietor may make his pond as large as the situation of the land above him will permit, thereby creating a large reservoir to be used in seasons of drought, and varying the flow of the stream. He may also erect a dam far above his mill, to be used merely as a reservoir dam."

In *Gould* v. *Boston Duck Co.*, 13 Gray, 442, the court said:—" One of the grounds of the plaintiff's complaint was, that when the water was very low, in time of drought, and the defendants detained it a few hours, or in one instance a whole day, to raise the water to a sufficient height to work their own factory, it came to the plaintiff's mill faster than he could use it, and ran to waste over his dam. If this was so it was because he had works not adapted to the entire or best use of the stream; because his dam was too low, his reservoir not of sufficient capacity, or other cause, by which he was prevented from making the best use of the power of the water, when only low by reason of drought. If there was a loss of water at such times and from such cause, it was not one for which the defendants were responsible. As there was no detention of the water in ordinary stages of water, and no other detention of the water by the defendants, in time of drought, than what was necessary to the reasonable use of their own mills, we are of opinion that it was not their duty, in point of law, to open their gates or 'leave them open without using the amount to such extent as they might, merely because the plaintiff's works were of such a character that his necessities required such flow of the water."

See *Davis* v. *Getchell*, 50 Maine, 602; *Timm* v. *Bear*, 29 Wis., 255; *Hoy* v. *Sterrett*, 2 Watts, 327; *Whaler* v. *Ahl*, 29 Penn. St., 98; *Clinton* v. *Myers*, 46 N. York, 511.

In the case of *Keeney & Wood Mfg. Co.* v. *Union Mfg. Co.*, 39 Conn., 576, (1873,) the plaintiffs owned paper mills on the Hockanum river, and the defendants a cotton factory a quarter of a mile above on the same stream. The plaintiffs ran their paper mills day and night when they had water, and the defendants their cotton mill only by day. The defendants detained the water of the stream during the night

in times of drought, in order to get sufficient water to run their factory during the whole twelve hours of each day. The plaintiffs complained that the detention of the water by the defendants prevented the running of their mill in the night season, and in the day time the water came down in such excessive quantities that it ran to waste over their dam; and prayed for an injunction to restrain the defendants. A part of the marginal note is as follows:—"The right in such a case of the upper mill-owner to make the stream useful to him by detaining the water during the night, is of the same quality as the right of the lower mill-owner to take the benefit of the constant flow. In deciding between these conflicting rights there are to be considered, 1. The custom of the country as to the running of mills. 2. The local custom, if there be one. 3. What general rule will best secure the entire stream to useful purposes. 4. Whether the detention of water is necessarily an injury to the lower mill, and whether the apparent injury is not caused by the insufficiency of its own privilege. The maxim "*aqua currit et currere debet*," is applicable rather to the matter of the diversion of a stream and to the ordinary rights of riparian proprietors as such, than to the case of mill-owners, who have a right to make a reasonable detention of the water by dams for the purposes of their own mills." The bill was dismissed.

See also Washburne on Easements and Servitudes, 272, sec. 30 *b.*; Gould on Waters, sec. 218; Wood's Law of Nuisances, sec. 371.

CARPENTER, J., concurred in this opinion.