# CIRCUIT COURT OF BALTIMORE CITY.

Filed November 11, 1912.

EMILIE A. EMERSON
VS.
ISAAC E. EMERSON.

*Geo. Whitelock* and *W. S. Bryan, Jr.*, for Emilie A. Emerson.

*Gans and Haman* for Isaac E. Emerson.

BOND, J.—

The bill of complaint filed at the institution of this suit alleged that the husband had abandoned the wife more than three years previously, and upon that allegation prayed that a divorce a vinculo might be granted, and that the wife might be "declared to be entitled to receive by way of alimony such an allowance from her said husband as may be proportionate to his means and station in life." The defendant made no answer, and a decree pro confesso was duly entered. And, subsequently, during the taking of testimony before the examiner there was offered in evidence an agreement between the parties, under the following introduction :

"It is agreed in the above case that no testimony need be taken bearing on the question of alimony and counsel fees, both parties hereby admitting that a proper and reasonable arrangement in reference thereto to be incorporated in any decree of absolute divorce that may be granted the plaintiff under the bill now pending herein is as follows" :

The arrangement is then set out in five provisions :

1. That the husband shall pay the wife $28,800 per annum, in monthly instalments, during her life.

2. That he shall pay $5,000 to each of his wife's counsel.

3. That to secure the payment of the alimony, he shall deposit a certificate for 600 shares of the stock of the Emerson Drug Company with trustees who shall, upon default in the payment of the instalments of alimony, have the stock transferred to themselves, and then collect the dividends to apply on account of instalments due or to become due. That after the wife's death the stock shall return to the husband : and that, until default in payments of alimony he shall continue to vote it.

4. That the furniture in the former residence of the couple shall remain the property of the wife with the exception of some books to be selected by the husband, a portrait, and a few curios.

5. That an "Italian Garden" adjoining the residence shall remain appurtenant to the residence, which is the wife's property, as long as the wife shall reside there ; and any purchaser of the residence from the wife shall have an option to purchase the garden from the husband at a price fixed.

Then follows (6), a specific promise on the part of the husband to pay the

alimony of $28,800 annually; and (7) an agreement that if the Court should think it beyond its jurisdiction to incorporate in the decree the provisions in paragraphs 3, 4, 5 and 6, the parties should abide by them nevertheless.

The arrangement set out in the first five paragraphs of the agreement was adopted by the Court and appears in the same words as part of the final decree.

Now a petition is filed by the husband alleging that the divorced wife has since remarried, and praying that, in view of the fact that the law now places upon her present husband the obligation to furnish her maintenance and support, the petitioner shall be relieved from his obligation under the decree to maintain and support her, or to make her any further payments of alimony as provided in the decree.

A demurrer is filed to this petition; and thus the Court is required to determine whether such relief may be granted upon the facts stated.

The questions raised have an importance reaching far beyond this particular case. In this present year some of them have been presented upon somewhat different facts in two other cases in this court. In one there was a petition by a divorced wife for an increase of permanent alimony over an amount fixed while her husband was in a bad financial condition, which proved temporary, and from which he has since passed to comparative prosperity. And in the other case a divorced husband, alleging that by reason of loss of earning power he was unable to comply further with the Court's decree, prayed a modification of it to relieve him from liability for arrest upon attachment for contempt for disobedience. And it is obvious that such subsequent changes in the conditions upon which permanent alimony is first fixed, must occur and raise the same questions frequently.

At the outset it is urged here, as it was in the other cases just described, that this petition prays for the modification or rescission of a final decree, and so must be denied under the ordinary rule that a valid final decree can not be opened for modification or be descinded after enrolment and after the end of the term at which it was rendered. And the decision of the Court of Appeals of Maryland in McCaddin vs. McCaddin, 116 Md., 567, is cited as having determined that decrees for permanent alimony fall within this general rule.

There has been some disposition manifested on the part of counsel in other cases here to accept this as the decision of the McCaddin case, but my conclusion is that the opinion will not bear that construction. It does quote an extract from 2 Am. & Eng. Encyc. of Law (2 ed.), 135, in the latter part of which the power to alter a decree for permanent alimony is denied. But I do not think the opinion justifies any inference that the Court of Appeals meant this quotation to state its own conclusion on that point, even as a dictum. The question before the Court was whether a decree for alimony independent of divorce, under the jurisdiction exercised by Maryland courts long prior to the time of judicial divorces in this State, was unjust and erroneous in failing to provide for subsequent changes of circumstances. The Court concluded that such a decree was by its nature modifiable and adaptable to changed circumstances without special provision; and it is in support of that conclusion that the extract referred to was quoted. That extract pronounces upon the point which the Court had under consideration—and then states a rule on the possibility of modifying a decree for permanent alimony upon a divorce a vinculo, a subject with which the Court of Appeals had no concern, and to which it gave only passing notice, remarking the diversity of opinion among courts which had had to consider the point, and the absence of the same difficulty in the case at bar. I think the opinion rather leaves the question open, to be solved as one of first instance in this State.

Confining the inquiry, first, to the question of the Court's power to modify or revoke a decree for permanent alimony, my conclusion is that the Court, merely by reason of the prospective nature of such a decree, must have that power.

A decree which divorces a married pair, and also provides for alimony to be paid the wife in instalments from time to time, is a decree of a double nature. Its two sentences are in character quite distinct. The sentence of divorce is an adjudication of the effect in law of past or fixed facts; abandonment, adultery, or whatever the ground

of divorce may be. The provision for payments of alimony is a continuing or running order which imposes a duty for the future, necessarily defined by the decree in view of present conditions, but necessarily to be performed in conditions which a court can not, in most cases, at least, pretend to foresee. It is obviously proper that the first sentence shall remain permanent and unchangeable under, substantially, all circumstances. But with the second sentence that can not be. The Court can not enforce one and the same performance in all the changing conditions of a man's life, and, either directly or indirectly, its decree must sometimes yield so that its requirements shall meet the possibilities and the proprieties of the altered circumstances. If the divorced parties should remarry each other, the Court's decree must, of course, be revoked, or continue on the dockets a solemn futility. And if a husband should be crippled and his earnings be reduced below the amount he is ordered to pay as alimony there must, in some manner be a modification of the Court's demand.

Recently, in this court, a railroad employe, ordered· to pay alimony pendente lite out of a good salary he was earning fell sick and seemed permanently incapacitated, and was made dependent upon a pension from an employe's relief fund. The order having been only pendente lite, was readily modified to meet the changed situation, the Court's power at that stage of the case being beyond question. But if the case had been instituted earlier, and carried to final decree before the man fell sick, the alimony required of him then, if any would have been permanent alimony; and whatever the external form of the proceeding followed, the Court must have made exactly the same modification in its requirements. In another recent case, also in this court, a man required to pay alimony had lost his position after the final decree, and filed a petition for a temporary reduction of the payments required of him. At the same time an attachment for contempt in failing to comply with the terms of the decree was outstanding against him. That situation was met by an order suspending punishment for contempt during such time as the man should pay a reduced amount, or until the further order of the Court. And thus the decree in that case was modified in fact, with lip-service to the rule that a final decree is not, after its enrollment, subject to such modification. Upon further reflection I think I should have passed an order frankly suspending and modifying that decree.

It is said in some of the decisions that his necessity can be met by a reservation in the decree itself of the power to modify. But decrees without such a reservation must and will be modified in one form or another. And if in this matter of alimony we must strictly apply the rule that enrolled decrees are not subject to modification, then the reservation must be attached to every decree. But a reservation which is so clearly of the essence of every decree ought not require expression in any. An essential of a decree, or of any other act of a court, obviously should not be left dependent upon an express statement of it.

I am aware that one consequence towards which this reasoning leads is that any final decree of a court for future action, such as a permanent injunction restraining a nuisance, some forms of mandatory injunctions and the like, must be subject to modification and revocation. But I am disposed to accept that as a correct conclusion. If after an unauthorized act is declared a nuisance and permanently restrained as such, the authority needed is conferred, the decree must be revoked, either expressly or by being ignored and disregarded. That was the situation presented in the Wheeling Bridge Company Case, 18 How. 421. The Supreme Court held that so much of the decree in that case as directed the abatement of the obstruction of the river, required the removal of the unauthorized bridge, and enjoined any reconstruction or continuance of it, which the Court describes as an "executory and continuing decree," was revoked by operation of law on the passage of the Act of Congress authorizing the bridge. But cases may arise in which the authority needed will come not from law-making bodies, but from private individuals; and there the rescission or modification must come from the Court, unless it is satisfied with merely ignoring its outstanding decree. Other courts which have had to deal with the situation presented by facts similar to those of the Wheeling Bridge

Company case have expressed the opinion that it would be safer and more respectful for persons now authorized to do the act previously enjoined to submit the facts to the Court itself and obtain its sanction for conduct which might otherwise be in disrespect of its authority and its solemn decree as it stands.

Wetmore vs. Law, 34 Barb. 515.

Keogh vs. Railway Co. 195 Pa. St. 131.

Township of Erin vs. Plank Road Co., 115 Mich. 465.

None of the reasoning ordinarily given in support of the rule that an enrolled decree is not susceptible to modification, applies, so far as I can see, to a running decree of this type. There has been no adjudication upon facts now urged. The application does not seek to open the decree to let in a defense which existed at the time of the decree. Nor does it seek a rehearing for there has been no hearing on the situation now presented. It has not been settled by the decree.

Merely by reason of the prospective nature of the decree for permanent alimony, then, commanding, as it does, performances in future situations impossible to provide for in advance, the Court has, in my opinion, power to alter such a decree to adapt its requirements to changes in the basis of the allowance made, and, if the changes should demand it, to revoke the allowance altogether. And the argument to the contrary seems to me to proceed, furthermore, from a mistaken conception of the position and effect in law of an allowance of permanent alimony upon divorce. And here it will be well to consider, for all the purposes of the case, the origin and purpose of the allowance in the law of Maryland. The history of this jurisdiction has been traced several times in the decisions of the Court of Appeals, and more recently, and somewhat more fully by Chief Judge Alvey in Tolman vs. Tolman, 1 App. Cas. D. C. 299, &c.

It has been a matter of dispute whether in England during the 17th and 18th centuries the courts of equity ever granted allowances to a wife for separate maintenance and support to be paid by the husband out of his own resources. Generally, those courts confined themselves to the wife's equity to a settlement and separate maintenance out of her own property when forced by her husband's abuse to live apart from him. Divorces were granted sometimes by special acts of Parliament, but mainly in judicial proceedings in the ecclesiastical courts. These latter courts had power to grant divorces both a vinculo matrimonii and a mensa et thoro; but divorces a vinculo were never, after the early part of the 16th century, granted for causes arising subsequent to marriage, such as adultery. The grounds thereafter recognized for this latter class of divorces were only consanguinity or affinity within the prohibited degrees, mental incapacity, impotence, force and error, impuberty, infancy and prior existing marriage of one party, all grounds for nullification rather than for divorce as we now understand the word.

Shelford on Marriage and Divorce, 365 (33 Law Lib.).

1 Bishop on Marriage and Divorce, Secs. 1498-1499.

As an incident to its divorce a mensa et thoro the ecclesiastical court from an early date granted the wife a separate maintenance payable by the husband out of his own resources; and that separate maintenance was "alimony." The explanations given for this allowance vary somewhat. Poynter (Doctrine and Practice of the Ecclesiastical Courts, p. 259, 13 Law Lib.) says: "This doctrine of the liability of a husband to the payment of alimony and costs rests on the presumption of law that by marriage the property of the wife rests in the husband." But it seems clear that the courts actually extended the obligation of support imposed on the husband by law for and during cohabitation, to the newly decreed condition of separate habitation. Such has been the generally accepted meaning and purpose of the allowance by the ecclesiastical courts. It was defined as including "food and clothing for the sustenance and care of the body and habitation or necessary things, essential to the support of life." And it was regularly estimated according to the abilities and station of the husband.

Garland vs. Garland, 50 Miss. 694.

Trotter vs. Trotter, 77 Ill. 510.

Oughton, Ordo Judictorum oo. tit. 206.

Poynter, 246 (13 Law. Lib.).

The duty thus imposed, or continued, was open to variation from time to time as the circumstances of the husband might vary materially; and so the allowance might be increased or reduced.

Oughton, tit. 206.

Shelford, p. 596 (33 Law. Lib.).

Poynter, p. 255, etc. (13 Law Lib.).

Remarriage of one of the parties was of course not then a possible ground for variation, as the divorces granted were only from bed and board, and did not leave the parties free to make such remarriages.

It must be observed that this variability of the decree for alimony in the ecclesiastical court is not to be explained upon the supposition that that court did not have the general rule as to finality of decrees. The rule seems to have been entertained and applied there as far as the nature of the jurisdiction exercised permitted—as it must in every court which adjudicates upon fixed facts. But at the same time divorce litigation was regarded as being of an exceptional nature, rendering it as to alimony, or support of the wife, continuous during the joint lives of the parties; and there was a maxim that a marriage cause was never at an end.

Duchess of Kingston's case, 20 How. St. Tr. 355 and notes.

Poynter, p. 160.

Bishop on Marriage and Divorce, sec. 840.

The award of alimony was not a part of the decree of divorce, which was treated as final in many respects, but was a matter usually for a supplemental petition, which might be filed before or after the divorce decree, and on which a separate order would ordinarily be passed.

Browne on Divorce and Alimony, p. 267.

2 Bishop on Marriage and Divorce, sec. 840.

Such was the jurisdiction exercised by the ecclesiastical courts in England, up to the time of their abolition, in 1858.

No ecclesiastical court was ever set up in Maryland. And as early as 1689 we find it stated (Galwith vs. Galwith, 4 H. & McH. 477) that alimony was recoverable in Chancery, or the Court of the Ordinary. And during the succeeding century the High Court of Chancery appears to have exercised full jurisdiction over claims for alimony, or for separate maintenance by the husband, founded on his misconduct, although neither this nor any other court in Maryland, during that period, had power to grant divorces of either kind. And in so granting alimony alone the courts of chancery were regarded as acting in the place and stead of the ecclesiastical courts.

Helms vs. Franciscus, 2 Bland 565, with cases reviewed in the notes.

Divorce was not treated as a judicial function at all, in Maryland, prior to 1841. Until then divorces were given only in special acts of legislature. But a judicial award of separate support and maintenance by reason of the husband's misconduct lacked few of the elements of a divorce a mensa.

The power to grant alimony alone was expressly confined to the courts of chancery by the Act of 1777, ch. 22, sec. 14 (Bagby's Code, Art. 16, sec. 14), which provided "that the Chancellor shall and may hear and determine all causes for alimony, in as full and ample manner as such causes could be heard and determined by the laws of England, in the Ecclesiastical Courts there."

Wright vs. Wright, 2 Md. 429, 450.

Now the ecclesiastical courts in England, as has been noted, regularly modified their decrees for alimony, ordering increases or reductions of the amounts fixed, to fit conditions as they might alter materially from time to time. Alimony there being the judicial enforcement of the duty to support, with the parties separated, instead of living together, so in Maryland, by nature and by long familiar usage, alimony meant nothing more nor less than a continuing, adaptable burden, with about as much of the variability of the common law obligation of support as was practicable in a court. And undoubtedly the courts of equity in this state received and continued the award of alimony with this incidental adaptability to circumstances. And here the distinction between the award of alimony and the final decree of divorce was much more clearly marked than in England; for here divorces were granted only by the state legislature, and alimony was awarded only by the courts. To secure a divorce and ali-

mony too, in this state, prior to 1841 a wife was compelled to obtain a private act of legislature for the one, and an order or decree of a court of equity for the other.

Crane vs. Mcginniss, 1 G. & J. 474, 475.

In 1841 (Chap. 262) the legislature placed the power to grant divorces, both a mensa and a vinculo, in the courts of equity (Bagby's Code, Art. 16, secs. 36, &c.). And it further provided that in cases where a divorce is decreed alimony might be awarded (Bagby's Code, Art. 16, Sec. 15). I think this latter provision is to be taken as intending simply to join in one proceeding the two forms of relief which had heretofore been obtainable only in separate proceedings, as has been stated. By the most elementary rules of construction, too, the term "alimony" in that provision is to be taken as inserted according to its ordinary and long established meaning and effect. It is to be taken as meaning, therefore, continuation of the husband's duty of support, with its incidental adaptability to changed circumstances.

The courts of equity in this State, upon application for divorce, the Court of Appeals has said, "sits not in the exercise of its general and ordinary equitable jurisdiction, but as a Divorce Court; and must be governed by the rules and principles established in the Ecclesiastical Courts in England, wherein a similar jurisdiction has been exercised, so far as they are consistent with the provisions of the Code."

J. G. vs. H. G., 23 Md. 406.

Fisher vs. Fisher, 93 Md. 298.

And so it has been decided that the term "cruelty," in the Maryland statute, was to have the same interpretation as was given it in the Ecclesiastical Courts.

Coles vs. Coles, 2 Md. Ch. 341, 351.
Tayman vs. Tayman, 2 Md. Ch. 393, 399.

In Alexander vs. Alexander, 13 App. D. C. 334, decided while Chief Judge Alvey was a member of that court, it was said, referring to an act of Congress which gave additional powers to the courts exactly similar to those given by our Act of 1841, that "In giving this latter authority, however, it must be presumed to have done so as

it was then judicially understood and with all the qualifications and limitations that were then inherent in it. The authority was to grant alimony, if the court saw fit to do so, and no distinction was made in this regard between the two classes of divorce. It is very plain, therefore, that the allowance of such alimony in all cases was to be in accordance with the rules and methods then prevailing in the ecclesiastical courts or in courts of chancery exercising ecclesiastical jurisdiction or the jurisdiction conferred by the Act of Maryland of 1777."

And so it is the conclusion of a majority of the courts which have passed on the subject, and apparently, of all in which alimony is regarded as having the meaning and purpose here attributed to it, that an award of permanent alimony is adaptable to subsequent changes of circumstances.

2 Bishop on Marriage and Divorce, secs. 869-872 and 1077.

The Supreme Court of the United States, in Audubon vs. Schufeldt, 181 U. S. 575, 577-578, has said: "Generally speaking, alimony may be altered by that court at any time, as the circumstances of the parties may require." And it was a Maryland decree that the court had under consideration.

Courts of some other states, in cases cited in the argument, have denied the power of a court to alter a decree of permanent alimony. Some of them do so merely upon the general rule of equity courts, that decrees can not be altered after enrollment and the close of the term at which they were entered. For reasons which I have stated at length above, I have been unable to agree that the rule so governs an award of permanent alimony. But there is a more important argument made in others of those cases. It is well summed up by Nelson, who champions it (2 Nelson on Marriage and Divorce, secs. 903 and 933a). "Common-law alimony," he says, "was granted to the wife for her separate maintenance until the parties become reconciled, while the statutory allowance is in fact a final distribution of the property in order that the parties may be forever independent of each other. * * *"

"The ecclesiastical courts ascertained the husband's income and

awarded her a portion of it as maintenance. The modern courts ascertain the value of the husband's property and give the wife an equitable portion of it, or a gross sum in lieu of all her rights, or a sum payable in instalments which is granted in lieu of maintenance and her right of dower."

And later, in Sec. 933a, he expresses the view that in modern law alimony is not, as it was in the ecclesiastical law, a continuation of support required during the married state, but an allowance in a state of permanent separation unknown to the older English law. The wife has no longer, says Nelson, any interest in her former husband's finacial success, and is now no more than a creditor for a fixed established debt.

In Kremelberg vs. Kremelberg, 52 Md. 553, 568, Judge Bowie, in his dissenting opinion, cautioned that: "The effect of the decree in the one case, being widely different and more extensive than in the other, courts would be greatly misled, if they indiscriminately adopted rules designed in cases for a total divorce."

But the view expressed by Nelson is, I think, based upon premises which are not accepted in Maryland. His view of the origin and purpose of permanent alimony is rather a recent graft upon an institution which had quite a different origin and has had quite a different meaning in the law. It is not true of Maryland courts that they ascertain the value of the husband's property and give the wife an equitable portion of it, or a sum payable in gross or installments, in lieu of maintenance and her right of dower. The common practice here is to estimate the income of the husband, and to award the wife a fraction of that estimated amount to be paid at fixed intervals; and this is done, expressly, according to the rules and principles of the ecclesiastical law.

J. G. vs. H. G., 33 Md. 406.

Fisher vs. Fisher, 93 Md. 298.

Coles vs. Coles, 2 Md. Ch. 341, 351.

Indeed, in the great majority of cases which now come before the courts the husband has no estate or accumulated property to divide. Ordinarily he has only weekly or monthly wages. There is no reason for attributing to the legislature or the courts here the view that alimony upon an absolute divorce is a final distribution of the husband's estate when there is one, as distinguished from the alimony of the ecclesiastical law. On the contrary, one and the same statute in Maryland has provided for the award of one and the same alimony for divorces of both classes; and it is beyond question that the alimony awarded in divorces a mensa is subject to amendment. The familiar rule of statutory construction, too, would give the word "alimony" in the statute its ordinary, established acceptation. We have, furthermore, an express statutory provision covering the effect of divorce on property, and it has given the court power only to return to the wife property of her own (Bagby's Code, Art. 16, sec. 38). And I do not see in the absolute, final divorce provided for by this statute, any peculiarity which makes the theory of continued support inapplicable. It is clearly possible. and reasonable, to extend the obligation of support beyond the separation by absolute divorce. The theory that the wife is now an entire stranger with an ordinary debt created in her favor would seem, logically, to deny the courts of equity power to punish the husband by imprisonment, for contempt in not paying amounts due, a power now exercised on the theory that alimony is not a debt, but a continuing duty that the court imposes upon him.

Phelps' Jurid. Equity, sec. 84.

Alimony is not a debt. "It is the judicial ascertainment and declaration of a specific duty which the husband owes to the wife, in accordance with the law of that favored relation, and is akin to the ordinary decree for specific performance. In the apt language of the Supreme Court of California: "The husband is bound to support the wife, yet this duty is an imperfect obligation which is not technically a debt. He does not owe her any specific amount of money, but he owes a duty to her which may be enforced by the order of the court compelling him to °pay her alimony."

Tolman vs. Leonard. 6 App. D. C. 224, 233.

And if alimony were a final division of estate, then logically an antenuptial agreement in which the wife waives all claim to any interest in the husband's estate, would deprive her of

alimony upon a separation. But, according to the authorities, it does not.

14 Cyc. 771, "Divorce—Antenuptial Contract."

Stearns vs. Stearns, 66 Vt. 187.

And, again, a division of estate would not be affected by the death of the husband before the wife; but alimony, by the rule generally adhered to, is an obligation for payments only during the joint lives of the parties, as is the obligation of support, and as was the obligation of alimony in the ecclesiastical law.

2 Bishop on Marriage and Divorce, sec. 836.

McCaddin vs. McCaddin, 116 Md. 574.

Dewees vs. Dewees, 55 Miss. 315, 319.

But for the reasons stated further above, I think it is sufficiently clear that alimony in Maryland, upon an absolute divorce, is a continuation and extension of the obligation to support, and so subject to amendment or revocation.

"The whole theory of the allowance of alimony is based upon the ground that the relation of husband and wife continues in full force and that the moral and legal obligation of the husband to provide for the support and maintenance of his wife remains unimpaired; and alimony is only a commutation of the support and maintenance provided under normal conditions."

Alexander vs. Alexander, 13 App. D. C. 334.

And this seems to be the view accepted by most of the authorities.

2 Bishop on Marriage and Divorce, secs. 847, 869-872.

3 Pomeroy's Equity Jurisprudence, sec. 1120.

Keezer on Marriage and Divorce, sec. 317.

There are arguments of much strength which may be urged in support of another conception of the relation of a wife to a husband's accumulated property. In the community of property provided for in some of the southwestern and Pacific states of this country, there is a property relationship which is based upon the same ideas as those which appear, in some of the decisions, to have suggested the extended definition of alimony. But, however desirable it may be that such ideas and such property relationship should be adopted, it is not the office of a court to promulgate them as law, either in the guise of alimony or otherwise. It is sufficient for the court that those ideas have not found expression in any of the rules of law with which it is to be guided. What they seek is certainly not, in my opinion, alimony.

In argument, attention was called to the fact that in Maryland, as elsewhere, the wife is, by the divorce, cut off from her dower and thirds in distribution of her husband's estate after his death; and from this it was argued that alimony should be considered as including an allowance to balance that loss, and so should be, to that extent, considered a division or distribution of estate. Here again the answer seems to be that while an allowance for such loss might, perhaps, be justly made to the wife, either in the guise of alimony or otherwise, an award of alimony does not include any such reimbursement. There are some statutes in some of the states of this country providing this reimbursement for the wife upon a divorce (for instance, sec 51 Ohio St. 207), but none in Maryland. As has been noted, the only statute in this state covering the distribution of property upon divorce, provides for a return of the wife's own property. Bagby's Code, Art. 16, sec. 38. The rights of dower and thirds are not rights which a wife has during her husband's life. She is entitled only in distribution of his estate after his death. The courts have denied the divorced wife dower and thirds upon the death of her husband merely for the reason that she did not fulfill the requirement of being under coverture at that time. There seems never to have been any allowance made for the fact that the husband's misconduct may have put the wife in this position. This rule obtained even during the time when adultery was ground for divorce a vinculo in the ecclesiastical courts.

Frampton vs. Stephens, 21 Ch. D. 164, 166.

"As the English common law never recognized dower unless the woman were covert of the man at his death, our courts can not create the right by construction, merely because in conse-

quence she is found in circumstances unknown to the common law."

2 Bishop on Marriage and Divorce, sec. 1633.

And as to the wife's "thirds" the husband could, and can now, destroy all possibility of it by gifts of his personalty, so that the interest of the wife has hardly been one to be allowed for in an award of alimony upon divorce.

If it is accepted as settled, then, that alimony upon a permanent divorce is, in this state, continued support of the wife, and is subject to modification or revocation upon change in the basis of its allowance, what if any modification is required by the re-marriage of the wife? What change in the basis of the allowance of alimony does that re-marriage constitute? And in taking up this question, we still defer consideration of the effect of the agreement and decree in this particular case. The alimony being a continuation of the legal obligation of support, then when a second husband by marrying the divorced wife takes upon himself that legal obligation, the allowance of alimony should logically, be revoked. And such is the rule, I think, which is supported by the authorities referred to in argument. On this point there are many decisions of the courts in other states, and they present directly opposite conclusions. The arguments urged in the opinions on each side of the question vary somewhat, but in the main, so far as a dividing line can be traced at all, the one conclusion or the other is arrived at according as the Court regards alimony as a final division of estate, of community property as it were, or as a continuation of the common law obligation of support. In some of the cases special statutes have determined the result; but in the absence of statute the decisions seem to divide upon the definition and purpose of alimony.

"The solution of this question depends upon the theory of the allowance made by the court upon dissolving the marriage. If alimony is considered a sum in lieu of dower, a compensation and a payment in lieu of a division of property acquired by joint effort, or a decree for a sum brought the husband at marriage, no subsequent conduct of the wife should release her former husband who has

now become her judgment debtor. On the contrary, if the sum awarded is regarded as a kind of pension, an equivalent for the obligation created by marriage to support the wife, and which obligation is released by divorce, then it would follow that when the divorced wife marries another her second husband assumes the obligation of suport, and the pension is terminated. Or, if the second husband has not sufficient ability, the amount may be reduced if she marries again —the facts of the case may show that the Court acted upon one theory or the other."

Nelson on Marriage and Divorce, sec. 933.

"In a measure the difference in opinion is based upon the light in which alimony is viewed, and the sense in which it is construed. In those states in which the courts of highest resort have outlined alimony as a part of a husband's possessions decreed absolutely to a wife, as that to which she in equity would be entitled, either as having been accumulated by their joint labor, or as having been set apart to her much in the nature of a dower, a re-marriage by the wife, as a matter of course, would place no bar upon her claim. Alimony thus considered is well likened to the property of a partner which, the partnership being dissolved and the assets divided between the members in proportion to the original amount invested, is held by the other partner as trustee for the first, the share of the first to be paid to him at certain times and in certain specified amounts by the second. * * * On the other hand, those states which have borrowed their ideas of alimony from the English ecclesiastical law, and hold it to be an allowance made to a wife for her support, as when divorced a mensa et thoro, consider that any accession by her of such financial support, whether by remarriage or in any other way, as would render her former husband's contribution to her maintenance no longer necessary, would be ample basis for a court of equity to relieve the prior husband of an unjust burden."

35 Central Law Journal, 480—"Remarriage of the wife a ground for the Reduction of Alimony."

The courts of Maryland having clearly, and expressly, received theid ideas of alimony from the English ecclesi-

astical law, would in accordance with these readings of the authorities, consider the wife's remarriage as ground for a modification of alimony. Whether in any case remarriage might require only reduction of alimony, rather than total cancellation, is a question upon which the authorities are not agreed. In Massachusetts, for instance, the courts consider the wife's remarriage as requiring reduction only although it may, according to evidence taken in a particular case, be reductional to a nominal sum.

Southworth vs. Treadwell, 168 Mass. 511.

Other courts hold to the view that the new husband's obligation of support is obligation for entire support as was the first husband's, that the substitution of the one obligation for the other is complete, and, therefore, that alimony should be canceled altogether. This latter view, I venture to think, has the better argument in its favor; but a decision of that point is not necessary here, in view of the conclusion I have come to on the whole case.

Such seems to be the rule as to the effect of remarriage in Maryland; and I think the justness of it would hardly be questioned when it is applied to the usual case of alimony required to be paid by a weekly wage earner, however, much it may be desired to give a divorced wife something more than alimony in cases where the husband is a man with accumulated wealth. And now, passing on from these rules for the generality of cases, what is the special effect of the agreement of the parties and the decree in this case. It is frequently stated as a rule that any agreement of the parties during the pendency of a divorce suit is one which the law, as a matter of wise policy cannot tolerate, and is therefore void. The reason given for such a rule is that parties can not ordinarily be brought together in agreement at all without agreeing on the divorce, which is the reason and basis of the alimony agreed upon. And the law has not as yet been brought to sanction divorces by agreement.

14 Cyc. 770, "Divorce."

Speck vs. Dansman, 7 Md. App. 165, 168.

Seeley's App. 56 Conn. 262.

But this appears to be a broader prohibition than the weight of authority supports. The case of Daggett vs. Daggett, 5 Paige 509, more frequently cited than any other American case on this point, held that if made with the knowledge and approval of the Court, an agreement on alimony would be proper, and might be made the basis of a decree. And to the same effect are the leading text writers.

2 Bishop on Marriage and Divorce, sec. 702.

Nelson on Marriage and Divorce, sec. 915.

And it is common practice in this state to fix the amounts of alimony in decrees, upon an agreement of the parties which the Court thinks free from collusion on the divorce itself.

There is still a widespread disposition to regard all such agreements with suspicion, and it is held not competent for a husband and wife to make a valid agreement as to alimony during the pendency of a suit for divorce, independent of the sanction of a decree.

Silberschmidt vs. Silberschmidt, 112 Ill. App. 58, 67.

Hamilton vs. Hamilton, 89 Ill. 349.

Moon vs. Baum, 65 Iowa, 255, 257.

When the Court has examined such an agreement and approved it, the decree then based upon it is not an enforcement of the agreement, but is entirely the Court's own disposition of the question, upon a stipulation of a fact in issue, instead of upon testimony. And so, despite that agreement, the decree remains subject to the Court's ordinary power of modification and rescission. And as far as remarriage of the wife requires modification of the allowance of alimony, it will be made in case of an agreement exactly as in cases of no agreement.

Storey vs. Storey, 125 Ill. 608, 611.

Wallace vs. Wallace, 74 N. H., 256.

Southworth vs. Treadwell, 168 Mass. 511.

This whole case, as I see it, then, resolves itself down to the question: What change in the basis of the allowance provided for by the agreement and decree is brought about by the wife's remarriage?

Remarriage requires modification or rescission only of a decree for alimony, that is, for a continuation of support

as in the usual case. But it is possible that an agreement which is submitted to the Court may undertake to give the wife something other than alimony. In cases where the husband has an accumulation of property it may undertake to make a division with the wife; or, irrespective of an accumulation of property, it may undertake to pay an annuity in all events and contingencies, including the contingency of remarriage of the wife. According to earlier decisions it is, perhaps, doubtful if such an agreement would be permitted, and accepted in full as the basis of a decree. While alimony is continued in its original meaning and effect, a mere continuance of the legal obligation to support, an agreement on a division of property or on an annuity payable in all events, being more than the law requires, would in many and perhaps most cases involve an abandonment of contest and mutual concessions difficult to distinguish from an agreement on the divorce which is the ground of it all. But I have not found any authority for holding that the law should forestall collusion by that avenue by a sweeping prohibition of such agreements in all cases. It seems an agreement in a particular case may be permitted and the agreement made the basis of a decree if the court approves and thinks it proper. It is common, as has been said, to permit an agreement commuting alimony into a lump sum payable at once; and necessarily a decree upon that basis accepts the amount as proper to be paid in the face of all possible contingencies, including remarriage, and the payment made must be irrevocable.

Lehman vs. George, 56 So. Rep. 106 (Miss.).

True, in the commutation into a lump sum there is probably an advantage to the husband that is absent in case of agreement upon an annuity greater than the law requires for alimony, and that fact invests the latter agreement with greater probability of collusion. But I see no reason for denying a court power to accept such an agreement in any case. In the face of the decisions and statutes which give the wife upon divorce property benefits greater than ordinary alimony, it is idle to say that such a grant of benefits is in itself objectionable.

It is not necessary for me to discuss further in this opinion, however, the power of a Maryland court to decree more than alimony, or, more particularly to grant an annuity payable in all events, on the agreement of the parties. I think this court has actually decided and closed that question by passing this decree at the instance of the parties to this case, and the propriety of that decree is not open to question here, if at all.

The agreement in this case begins as a mere stipulation upon a fact in issue; the fact of a necessary amount for an allowance of alimony; and as such it was consistently filed with the examiner as a waiver of further testimony on that point. It is true the bill of complaint prays only alimony, in the usual form, and upon the strict rules of procedure, the husband, if he had not been in agreement upon it, might have objected to the grant of anything further in the decree.

Wallingsford vs. Wallingsford, 6. H. J. 485, 490.

But as I construe this agreement, the guise of a stipulation upon alimony merely is one not followed out in the arrangement itself, and we should blind ourselves to the fact if we should treat that arrangement as one for alimony. In the first place, the agreement provides an annual payment of $28,800, which is so large as to to appear something more than an allowance of mere support. Again it provides that these annual payments shall continue during the life of the wife, wholly irrespective of the time of the husband's death; whereas, alimony, confined within the limits of the legal obligation to support, terminates with the death of the husband.

McCaddin vs. McCaddin, 116 Md. 574.

It provides for a deposit of stock with trustees as security for the payment of the annual amounts as they become due; and no provision for cancellation of the obligation by any event during the lifetime of the wife is inserted in the terms of the trust, or elsewhere. Yet it does provide for a return of the stock to the husband upon the wife's death. There is, again, a complete, present transfer to the wife of all the furniture in the residence, with the exception of some pieces which the husband is to take finally. There is no doubt in my mind that by a reasonable construction of this agreement,

the husband undertook to pay this annual sum, and give her the other property benefits specified in the agreement, in the face of all such possibility as the remarriage of the wife, and notwithstanding such an event. And this arrangement is embodied in the decree which is not open to objection in this Court, as has been said. It follows, if these conclusions be correct, that the remarriage of the wife is no such change in the basis of the decree as might justify a modification of rescission of it as prayed in this petition.

I shall, therefore sign an order sustaining the demurrer and dismissing the petition. Counsel for the respondent will be expected to prepare the form of order which should also require the payment to the respondent of amounts which have fallen due since the filing of the petition. This form should be submitted to counsel for the petitioner, and any controversy over it will be set down for hearing on Thursday, November 14, 1912, among the alimony cases specially set for that day, unless for some reason that is not convenient to the parties.