The Hazard Powder Company *vs.* The Somersville Manufacturing Company.

First Judicial District, Hartford, May Term, 1905.
Torrance, C. J., Baldwin, Hamersley, Hall and Prentice, Js.

An upper riparian proprietor in using the water of a stream for power may detain it long enough and discharge it in a manner to make it useful, but such detention and discharge must be reasonable under the circumstances of the case.

Whether the use of water by an upper riparian proprietor is reasonable or not is a question of fact; but if all the subordinate facts are of record the conclusion of the trial judge may be reviewed.

Upon the question of reasonable use, evidence of the custom and usage of other persons carrying on the same business upon the same stream, or upon the streams of New England generally, in reference to day or night runs, mill hours, and other matters of like nature, is admissible.

The material facts in the present case reviewed, and the action of the trial court, in holding defendant's use of the stream to be a reasonable and proper one, sustained.

The trial court may properly refuse to mark as "proven" or "not proven" such paragraphs of the draft-finding as state evidential facts only.

Such refusal is not assignable as error, nor is it a ground for reversing the judgment.

Facts which are evidential only ought not to be incorporated in the finding.

There is no reason for adding to a finding certain facts which could not possibly affect the result flowing from those already found.

Argued May 2d—decided July 14th, 1905.

ACTION to restrain an upper riparian proprietor from an alleged unreasonable use, obstruction and detention of the waters of the stream, and for damages, brought to and tried by the Superior Court in Hartford County, *Robinson, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff. *No error.*

*Theodore M. Maltbie* and *William Waldo Hyde*, for the appellant (plaintiff).

*Arthur F. Eggleston* and *Marcus H. Holcomb*, for the appellee (defendant).

TORRANCE, C. J. The plaintiff is a corporation engaged in the manufacture of gunpowder, in mills at Scitico and Hazardville in this State upon the Scantic River; while the defendant is a corporation engaged in the manufacture of woolen goods in a mill at Somersville on said river, above the mills of the plaintiff; and the principal dispute between them in this case is whether the defendant, as an upper riparian proprietor, has made an unreasonable use of the water as against the plaintiff, a lower riparian proprietor.

The complaint alleges, in substance, that the defendant has wrongfully and unreasonably obstructed, detained, and used the waters of said river, and has thereby prevented them from flowing to the plaintiff's mills as they had been accustomed to flow, to the great injury of the plaintiff.

The answer denies such wrongful detention and use, and further sets up certain facts going to show that such use and detention of water by the defendant, as was alleged in the answer, was a reasonable and necessary use and did not constitute any invasion of the plaintiff's rights. The reply denies the facts so set up.

Upon the facts stated in the finding the court found the

issues for the defendant, and rendered judgment in its favor. The following is a somewhat condensed statement of the controlling facts found : The plaintiff and its predecessors in title have carried on the manufacture of powder at Hazardville and Scitico for more than fifty years. It employs about 90 work people at Hazardville and 10 at Scitico. In making powder the plaintiff uses five kinds of mills, called pulverizer, wheel, press, cracker, and glaze mills, respectively. The wheel mills are run by the plaintiff day and night; the glaze mills are sometimes run a portion of the night; the other mills run only a few hours in the daytime. For its night work the plaintiff employs two men at Scitico and five at Hazardville. These night operations of the plaintiff are carried on for the sole purpose of increasing the daily output of powder.

The mill-site of the defendant has been used and occupied as such for more than one hundred years; at first by a sawmill and grist-mill, to which was added later a fulling-mill, subsequently changed into a woolen mill. Since 1883 the defendant has carried on there the manufacture of woolen goods, and it now employs more than 300 persons in its mills. The defendant and its predecessors in title have always operated the mills on said location during the usual working hours of the day only, closing the gates at night and thus filling the pond for use next day; and such detention is necessary to the successful prosecution of the defendant's business. The dam of the defendant has existed in its present condition, except for renewals of planking, since 1836. Prior to 1897 the defendant used upon said dam flash boards about 9 inches in height, and since 1897 it has used thereon flash boards about 17 inches in height. Since 1897 there has been no change in the manner of using said stream by the defendant, except that the capacity of its pond has been increased by said increase of height in the flash boards. The defendant's pond has an area of about 52 acres and the fall of defendant's privilege is about 12 feet. The defendant runs its mills week days, beginning at half-past six A. M. and shutting down at six P. M., with

three-quarters of an hour nooning, excepting Saturdays, when its mills stop at one o'clock P. M.; and occasionally upon holidays its mills are shut down. The defendant detains the water of the river during the night, so far as the capacity of its pond will permit, for use the following day or next working day; " and during the working hours of each work-day the defendant discharges through its wheel or wheels the accumulated flow of said river and distributes it evenly through said working hours. . . . The water-wheel capacity of the defendant's mills before 1897 aggregated 196 horse-power, which in the year 1897 was increased to 247 horse-power, consisting of a 26 horse-power Hunt wheel, a 30 horse-power Houston wheel, two McCormack wheels of 58.5 horse-power each, and a 74 horse-power Hunt wheel. The water-wheels of defendant are so arranged that they can be run separately, or any 2, 3, 4, or 5 of them can be run in combination. The defendant always runs the 26 horse-power Hunt wheel, and next, if there is sufficient water, the 30 horse-power Houston wheel; and then, if there is sufficient water, the No. 1 58.5 horse-power McCormack wheel; and next, if there is sufficient water, the No. 2 58.5 horse-power McCormack wheel; and last of all, if there is water enough, the 74 horse-power Hunt wheel; so that the defendant's mills, so far as its water-wheels are concerned, are 26 horse-power, 56 horse-power, $114\frac{1}{2}$ horse-power, 173 horse-power, or 247 horse-power mills, depending upon the amount of water flowing in the stream. The water-wheel installation of the defendant is most excellently arranged and is well adapted to the size, capacity, and varying flows of the Scantic River, and the arrangement and use by the defendant of said water-wheels are wise, prudent, and reasonable. The said water-wheel capacity might properly be increased to about 360 horse-power to utilize the high flows of the river during the usual working hours of the day. . . . The defendant's use of the water of said river and of its water-wheels has been invariably adapted to the size and capacity of said stream, and to all of the varying flows therein, and said use has been and is an entirely reasonable

use; and in its manner of use it has not only followed the custom of mills upon the Scantic River, but the universal custom of textile mills throughout New England, and of all other industries, excepting paper mills, powder mills, and some rolling mills, and some electric light plants, which run day and night. Upon the trial of this cause the plaintiff claimed that the mill owners on the Scantic River, in the use of the waters of the stream for power, previous to 1897, had not exceeded what the plaintiff's expert called the 'standard development' of the stream; and I find that what is thus meant by the 'standard development' of a stream is the power which the stream affords by a natural, unobstructed flow, to be used in a continuous 24-hour daily use. And I further find that a wheel development of a mill privilege computed upon the so-called 'standard development' theory will result in a less number of horse-power than a development of the same privilege based upon a 10 or $10\frac{3}{4}$ hours' use of the concentrated flow. And this I find is true of the defendant's privilege. I find that the several mill owners on said stream, with the exception of the defendant and one other, have, up to 1897, been using at their several privileges water-wheels rated at less horse-power than the computations of the plaintiff's experts accord the same privileges under the 'standard development' theory. And I find there has been no custom of such 'standard development' on said stream. The Scantic River is a sensitive stream, quick to feel the effect of rain storms and melting snow and ice, and the high flows of water thus produced are quick to run off. Said stream has always been subject to very high and very low flows, sometimes pouring over the dam in large volume, and at other seasons of the year being so extremely low that the ponds would not fill by detaining the water during the night." The stages of low water occur at all seasons of the year, but more particularly in summer and winter. There are, besides the plaintiff's, nine developed water-sites, with dams and artificial ponds on the Scantic River and a branch of it, six of them being above the defendant's mills and two of them below, one of

which two is a paper mill. This paper mill runs day and night, but all the others, the plaintiff's mill excepted, run in the daytime only, closing their gates at night and detaining the water for use as the defendant does. This has been "the custom of mills on the Scantic River." It is the "custom of all water textile mills in New England to run during the day, running 58 to 60 hours per week, with a half-holiday on Saturday, shutting down nights and detaining the water for use the following day. The plaintiff failed to prove that there was a greater diminution from its maximum daily production of powder since the year 1897 than during the years preceding, and the plaintiff admitted, and I find it to be a fact, that the plaintiff suffered no diminution in its product, and sustained no damage by reason of the defendant's closing its mills Saturday afternoon. The plaintiff's ponds at both of its plants are small; and grass and weeds are growing up in the center of the one at Scitico, and this latter one has become largely filled up, and also smaller in area, and has failed to store the water let down from the mills above it. It is not sufficient to retain for use during the night the $10\frac{3}{4}$ hours' flow of water let down to it by the upper riparian proprietors. It is entirely feasible for the plaintiff, if it desires to run nights, to raise its Scitico dam, or erect a new dam at the site of the present dam at Scitico, so as to create a pond of sufficient capacity to retain and hold all the waters of the river let down by the upper mill owners during the usual working hours of the day; and such a pond would enable the plaintiff to operate its works nights as well as days to the extent of the entire flow of the waters in said stream. The raising of said dam $4\frac{1}{4}$ feet higher would overflow about 25 acres of land. The injury which the plaintiff alleges it suffered is imputable to the insufficiency of its present privilege at Scitico, and is not the result of detention of water by the defendant, as complained of by the plaintiff. The defendant has not diverted the water of said stream, and has never by its use and detention of the waters thereof had a purpose of injuring the plaintiff. It has not acted maliciously or wantonly,

but has acted with the sole purpose of obtaining the beneficial use of the stream for its own mills, and I find that all the acts of the defendant in endeavoring to obtain such beneficial use have been and are reasonable."

Upon these facts the court held that the detention and discharge of the waters of Scantic River, made by the defendant in the manner and under the circumstances detailed in the finding, was a reasonable, and therefore a rightful, use of said waters as against the plaintiff; and whether the court erred in so holding is the principal question in the case.

Upon the facts found the case involves, not the right of an upper riparian proprietor to divert, or pollute, the water, to the prejudice of a lower proprietor; nor the right of such upper proprietor to wantonly or maliciously detain, discharge, or use the water; but merely his right to detain the water for a reasonable time and to discharge it in a reasonable manner for the purpose and in the process of utilizing it for power.

As against a lower, an upper riparian proprietor has clearly the right to use the water for power, and this involves the right to detain it long enough, and to discharge it in such a manner, as will make it useful; but he has no right to detain or to discharge the water in an unreasonable manner. In cases like the present, for determining the question whether the use of the water by the upper riparian proprietor was rightful, the only general rule which the law has laid down, or perhaps can lay down, is that the detention, discharge, and use, must be reasonable under the circumstances of the particular case. *Keeney & Wood Mfg. Co.* v. *Union Mfg. Co.*, 39 Conn. 576; *Mason* v. *Hoyle*, 56 id. 255. See also cases cited in *Barnard* v. *Shirley*, 41 L. R. A. 737, 738 note (151 Ind. 160). The question in a given case, whether the use proved is a reasonable one, is essentially one of fact, in the sense that it is to be decided by the tribunal empowered to determine the facts; by the trial judge if the case is tried to the court, and by the jury if the case is tried to the jury. *Keeney & Wood Mfg. Co.* v. *Union Mfg. Co.*, 39 Conn. 576;

*Mason* v. *Hoyle*, 56 id. 255 ; *Parker* v. *Hotchkiss*, 25 id. 321. In this State, however, in cases like the present, where all the subordinate facts bearing upon the question of reasonable use are spread upon the record, the conclusion of the trial judge upon the question of reasonable use may be reviewed by this court. *Nolan* v. *New York, N. H. & H. R. Co.*, 70 Conn. 159. Assuming, then, that this court may do this and that the finding as made is to stand, we are of opinion, upon a careful consideration of the facts found, that, within the principles laid down in our own cases upon this subject hereinbefore cited, the trial judge did not err in holding that the defendant's use of the water was such a reasonable use of the water as it was entitled to make.

Certain other matters assigned for error remain to be considered. The first assignment of error relates to certain rulings upon evidence. Against the objection of the plaintiff, some seventeen witnesses for the defendant were permitted to testify as to what was the custom or usage of textile and other mills upon the Scantic River, and upon other streams throughout New England, as to the number of hours per day they ran, and as to whether they ran in the daytime only, or at night only, or both day and night, and other matters of like nature. This evidence of the usage, custom, or habit, of other manufacturers upon the Scantic River, and upon other streams, was offered and received solely as bearing upon the question whether the defendant's use of the waters of the Scantic River was a reasonable use under all the circumstances ; and we think it was admissible for that purpose. When the question of reasonable conduct under given circumstances is in issue, the usage, custom, habit, or conduct of others under similar circumstances may be relevant as evidence upon that issue; 1 Wigm. on Ev., § 461; *Cass* v. *Boston & Lowell R. Co.*, 14 Allen (Mass.) 448 ; *Maynard* v. *Buck*, 100 Mass. 40 ; and our own court in the case of *Keeney & Wood Mfg. Co.* v. *Union Mfg. Co.*, 39 Conn. 576, expressly sanctions the admission of such evidence.

The trial court held that the facts stated in certain para-

graphs of the draft-finding, which it was requested to mark "proven" or "not proven," were evidential facts merely, and refused to so mark them; and this ruling and refusal are each assigned for error.

Upon a careful examination and consideration of the paragraphs in the draft-finding referred to in these two reasons of appeal, we are of opinion that the ruling was correct, and the refusal was justified. While in a proper case the duty of a trial court to mark each paragraph of a draft-finding "proven" or "not proven" might, in a proper proceeding, be enforced, such refusal is not properly assignable for error on appeal, nor is it a ground for reversing the judgment. *Atwater* v. *Morning News Co.*, 67 Conn. 504, 527; *McNamara* v. *McDonald*, 69 id. 484, 489; *Morris* v. *Winchester Repeating Arms Co.*, 73 id. 680, 695.

Another reason of appeal relates to the action of the trial court in refusing to correct the finding by adding to it certain paragraphs of the draft-finding, namely: (1) all of those which the court refused to mark "proven" or "not proven," some forty-four in number; (2) certain of those which the court had marked "not proven," some ten or more in number.

With reference to the paragraphs of the first class, we think the court was justified in refusing to incorporate them into the finding, on two grounds: (1) because they embody facts mainly, if not entirely, evidential only, which under the rules of court cannot properly be made part of the finding; and (2) because, even if added to the finding, they would not at all affect the inevitable result of the other facts found; and whenever this is true there exists no good reason for correcting the finding. *Julian* v. *Stony Creek Red Granite Co.*, 71 Conn. 632, 638.

With reference to the second class of paragraphs above mentioned, relating to disputed facts found and marked "not proven," it is perhaps sufficient to say that upon the evidence certified to this court in connection with the exceptions, there is nothing upon the record to show that the court erred in finding said paragraphs not proven. In short,

we think the finding as it stands presents fairly all the facts necessary to raise all the questions of law which the plaintiff claimed it desired to raise with reference to the controlling question of reasonable use; and that the trial court committed no error in the trial or in the proceedings since the trial, or in the conclusion reached by it upon the main question in the case.

There is no error.

In this opinion the other judges concurred.