LAKE WILLIAMS BEACH ASSOCIATION ET AL. *v.*
GILMAN BROTHERS COMPANY ET AL.
(11995)

PETERS, C. J., DANNEHY, CALLAHAN, MENT and M. HENNESSEY, Js.

Argued June 11—decision released August 6, 1985

*Peter B. Cooper,* with whom were *Frank B. Cochran,* and, on the brief, *Linda Francois,* for the appellants (plaintiffs).

*Edmund W. O'Brien,* with whom was *George Gilman,* for the appellees (defendants).

PETERS, C. J. The dispositive issue in this appeal is whether lowering the level of an artificial lake to compensate for the inadequate design of a dam constitutes a reasonable use of water rights. The plaintiffs, owners of real property fronting on the shore of Lake

Williams in Lebanon, brought suit to enjoin the defendants, a dam owner and its lessee, from unreasonably drawing down the lake. The trial court held for the defendants and the plaintiffs appealed. We find no error.

The facts underlying this appeal are largely undisputed. The dam that created Lake Williams was erected in the mid-nineteenth century to supply water power for downstream industrial use. The dam consists of a 280 foot-long earthen embankment, into which is set a 39 foot-long stone masonry spillway. The distance between the top of the spillway and the top of the dam (the freeboard) is 1.8 feet. The level of the water in Lake Williams is controlled by opening and closing a 30 inch diameter steel pipe that runs through the spillway wall. The mechanism that operates this "gate" is located in a gatehouse atop the spillway. The named defendant, the Gilman Brothers Company (the defendant), is the successor in title to the dam site, the dam, and the right to impound and flow the waters of Lake Williams.[1] Gilman Brothers uses this water at its downstream plastics factory for cooling and fire protection. When surplus water is available, the defendant Bozrah Light & Power Company uses it to generate electricity pursuant to a lease agreement with the defendant Gilman Brothers.

Lake Williams is very shallow. It has a surface area of approximately 272 acres when full, yet it has a maximum depth of ten feet and an average depth of four and one-half feet. The lake was completely surrounded by undeveloped woodland until 1950, when construction of houses on lots adjacent to the lake began. The individual plaintiffs are owners of lakefront properties in this residential development. The named plaintiff is an association of development residents and holds title

[1] Lawrence Gilman, president of the Gilman Brothers Company, was also sued individually.

in its own right to two lakefront beach lots. The plaintiffs use the lake for fishing, boating, swimming and ice skating.

Before 1979, the defendant kept the lake as full as possible in the summer to ensure an adequate reserve of water for its factory, and the parties' uses of the lake were compatible. The level of the lake was relatively stable from March through Labor Day, after which it was normal for the water to be drawn down approximately one foot.

In 1976, as part of the United States army corps of engineers national dam inspection program, the engineering firm of C.E. Maguire, Inc., inspected the dam at Lake Williams. In its October, 1978 report, Maguire stated that the dam could not withstand the prescribed flood test because its spillway capacity was seriously inadequate. The report concluded that a test flood would overtop the dam by 2.31 feet, and recommended that Gilman Brothers engage an engineer experienced in the design of earth dams to make a detailed study of the dam and institute corrective measures. In the interim, the defendant was told that the lake "should be lowered and maintained at a level below the spillway crest to provide flood storage for storm events." An accompanying table showed that 4.11 feet of freeboard would be necessary to pass the test flood. The department of environmental protection (DEP), which has jurisdiction over dams pursuant to General Statutes §§ 22a-401 through 22a-410, requested the defendant to implement these recommendations by January 1, 1980.

Accordingly, Gilman Brothers hired the engineering firm of Buck & Buck to study the dam. In its interim February, 1980 report, Buck & Buck confirmed that the spillway capacity was inadequate. Buck & Buck issued its final report on March 5, 1982. It recommended

lowering the level of the spillway by three feet, which would increase the available freeboard to 4.8 feet at an approximate cost of $25,500. Alternate remedies of lengthening the spillway or adding an emergency spillway were discussed and rejected. The defendant was also told to keep the level of the lake approximately three feet below the spillway until the spillway itself was lowered.

On May 17, 1982, the DEP determined that the dam could not be classified as safe and ordered the defendant to repair or remove it. See General Statutes § 22a-402.[2] The DEP order provided in pertinent part: "The repairs or alterations to be made should include . . . 1. Provide spillway capacity adequate to discharge [the test flood] without overtopping the embankments." The DEP did not specify how its order should be implemented.[3]

In July, 1979, the lake was drawn down to three and one-half feet below the spillway, three feet below its normal summertime level. In order to facilitate Buck & Buck's inspection of the dam, the lake was almost completely drained in April, 1980. Between April, 1980, and March, 1982, the level of the lake fluctuated widely. Since the latter date, the lake has, with one notable exception, been maintained at approximately three feet below the top of the spillway. During a major rainstorm

[2] General Statutes § 22a-402 provides in relevant part that the commissioner of the department of environmental protection "shall investigate and inspect or cause to be investigated and inspected all dams or other structures which, in his judgment, would, by breaking away, cause loss of life or property damage. . . . If, after any inspection described herein, the commissioner finds any such structure to be in an unsafe condition, he shall order the person, firm or corporation owning or having control thereof to place it in a safe condition or to remove it . . . ."

[3] Proceedings are now pending before the DEP on the defendants' application for a permit to remove the dam. See General Statutes § 22a-403. The plaintiffs are represented at these proceedings. See General Statutes § 22a-408.

in June, 1982, the level of the lake rose from twenty-nine inches below the spillway to six inches above the spillway before cresting.

Since July, 1979, there has often been insufficient water in the lake for the recreational activities previously enjoyed by the plaintiffs. Large expanses of mud have been exposed, weed growth in the lake has increased and the market value of the plaintiffs' property has significantly declined.

The plaintiffs filed suit on September 8, 1981. The first count of their complaint alleged that by drawing down the lake, the defendants violated the plaintiffs' common law riparian rights. The second count claimed an impairment of the public trust in the waters of the lake. See General Statutes §§ 22a-15, 22a-16.[4]

The trial court ruled against the plaintiffs on both counts. It found that while the plaintiffs owned land abutting the lake, they had failed to allege or prove

---

[4] "[General Statutes] Sec. 22a-15. DECLARATION OF POLICY. It is hereby found and declared that there is a public trust in the air, water and other natural resources of the state of Connecticut and that each person is entitled to the protection, preservation and enhancement of the same. It is further found and declared that it is in the public interest to provide all persons with an adequate remedy to protect the air, water and other natural resources from unreasonable pollution, impairment or destruction."

"[General Statutes] Sec. 22a-16. ACTION FOR DECLARATORY AND EQUITABLE RELIEF AGAINST UNREASONABLE POLLUTION. The attorney general, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford-New Britain, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction."

ownership of any portion of the lake bed.[5] The court therefore concluded, on the first count, that the plaintiffs had no riparian rights in the waters of Lake Williams. The trial court held that recovery under the second count was barred by the necessity of maintaining the lake at the lower level. On appeal, the plaintiffs claim that the trial court erred in holding that they have no riparian rights and in finding that the lake was drawn down out of necessity.

The plaintiffs' claims are defeated by the factual findings of the trial court. Even if it is assumed, arguendo, that the plaintiffs are riparian owners, they cannot prevail on the first count of their complaint. It is settled law that "[e]ach riparian owner is limited to a reasonable use of the waters, with due regard to the rights and necessities of other such owners." *Harvey Realty Co.* v. *Wallingford,* 111 Conn. 352, 359, 150 A. 60 (1930); see *Agawam Canal Co.* v. *Edwards,* 36 Conn. 476, 497–98 (1870); *Wadsworth* v. *Tillotson,* 15 Conn. 366, 373, 39 A.D. 391 (1843); see generally 7 Clark, Waters and Water Rights (1976) § 611; 4 Restatement (Second), Torts §§ 850, 850A (1977). In balancing competing claims to the waters of an artificial lake, we have held that riparian owners may prevent only the unreasonable lowering of the lake by a dam owner. *Labbadia* v. *Bailey,* 152 Conn. 187, 190, 194, 205 A.2d 377 (1964); *DeWitt* v. *Bissell,* 77 Conn. 530, 535, 60 A. 113 (1905); see also *Brown* v. *Ellingson,* 224 So. 2d 391, 393–94 (Fla. App. 1969); *Taft* v. *Bridgeton Worsted Co.,* 237 Mass. 385, 388–90, 130 N.E. 48 (1921); *Stidham* v. *Algonquin Lake Community Assn.,* 133 Mich. App. 94, 97–99, 348 N.W.2d 46 (1984); 7 Clark, Water and

---

[5] The trial court issued its memorandum of decision on December 29, 1982. On January 5, 1983, the plaintiffs filed a motion for a new trial, seeking to introduce additional evidence on the issue of whether they owned land beneath the lake. The motion was denied and the plaintiffs included this denial as a claim of error on appeal. Our disposition of the plaintiffs' other contentions obviates any need to address this issue.

Water Rights (1976) §§ 615.2, 633. Whether a competing use is reasonable is a question of fact that depends on the specific circumstances of each case. *Hazard Powder Co.* v. *Somersville Mfg. Co.*, 78 Conn. 171, 177, 61 A. 519 (1905); *Mason* v. *Hoyle*, 56 Conn. 255, 262, 264, 14 A. 786 (1888).

The factual record developed in this case compels the conclusion that the defendants' reduction of the level of Lake Williams is reasonable. Two engineering firms independently recommended the reduction and the trial court specifically found those recommendations to be warranted, especially in light of the rapid rise of the lake during the June, 1982 storm to within inches of overtopping the dam. The trial court further found that the defendants are maintaining the lower level because of the engineers' recommendations. While the plaintiffs have attacked these findings, they have not shown them to be clearly erroneous in light of the evidence adduced at trial. See *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). In sum, even if the plaintiffs have common law rights in the waters of Lake Williams, those rights were not violated by the defendants' reasonable exercise of their own riparian interests.

The plaintiffs' contention that the trial court erred in finding no impairment of the public trust in the lake is likewise refuted by the trial court's findings of fact. It is an affirmative defense to a charge of impairment that, "considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare." General Statutes § 22a-17. Although the defendants did not specially plead this defense; see *Manchester Environmental Coalition* v. *Stockton*, 184 Conn. 51, 63, 441 A.2d 68 (1981); the evidence relating to this issue was admit-

ted without objection and the defect in pleading is therefore deemed to have been waived. *Damora* v. *Christ-Janer,* 184 Conn. 109, 112, 441 A.2d 61 (1981); *Royal Homes, Inc.* v. *Dalene Hardwood Flooring Co.,* 151 Conn. 463, 466, 199 A.2d 698 (1964). The trial court explicitly held that the affirmative defense had been proved, and this conclusion is amply supported by the record.

It is unfortunate that the plaintiffs, through no fault of their own, must suffer because of outdated nineteenth century engineering. The defendants, however, are equally blameless for the current state of affairs. The plaintiffs must seek a remedy elsewhere.

There is no error.

In this opinion the other judges concurred.