[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
History of the Case
The present action is brought by an owner of land known as 238 Scotland Road, Windham, Connecticut, whose western boundary is the highwater mark of a pond and land there under known as Windham Frog Pond.
Windham Frog Pond so called is an artificial pond created by the erection of a dam, the origin of which is traceable to the Colonial Era and which has previously figured in historical accounts of events that occurred there.
Frog Pond is a 21-acre nonnavigable pond located in Windham Center, Connecticut.
The defendant represented himself to be the owner of Frog Pond and over the years abutters and neighboring property owners have requested of the defendant permission to use the pond. Occasionally, permission was granted by the defendant.
When the plaintiff purchased his property, he too requested permission to use the pond. However, at some point, he believed that he had the right to use the pond, without the defendant's permission or permission from the defendant's predecessor, Marvin Edelman. CT Page 9033
The plaintiff brought a three-count October 9, 1997 complaint against the defendant. The complaint alleged 1) interference with riparian and/or littoral rights, 2) trespass, and 3) nuisance. The plaintiff sought a temporary and permanent injunction to prevent the defendant from blocking access to Frog Pond. On October 29, 1997, Honorable Samuel J. Sferazza, Judge, granted a temporary injunction. On February 2, 1999, the defendant filed a two-count counterclaim, alleging trespass and seeking a declaratory ruling from the court as to the rights of the parties in and to the Frog Pond. On June 30, 1999, the defendant amended the prayer for relief in his counterclaim.
The plaintiff withdrew the trespass and nuisance counts during the trial, leaving his one-count complaint alleging interference with his riparian and/or littoral rights, and leaving the defendant's two-count counterclaim as matters which are presently before this court.
Frog Pond was created as the result of "impounding" its waters with the use of dam, which was constructed in Colonial Era times. The body of water which became Frog Pond has been called by several names since the time of its creation: Stony Plain Brook (deed from Town of Windham to John Reed (Senior), dated January 7, 1703, and recorded in Volume C, Page 51 of the Windham Land Records) (Defendant's Ex. 1); Ormsby's Brook (deed from Jonah Palmour to John and Elizabeth Spencer et al, dated 1730, and recorded in Windham Probate, Volume 1, Page 384) (Defendant's Ex. 1); Follet's Mill Pond (deed from Abraham Hill to Benjamin Follet, dated April 3, 1750, and recorded in Volume 1, Page 428 of the Windham Land Records (Defendant's Ex. 1); and finally, Frog Pond (deed to Mary Follet, dated April 3, 1828, and recorded in Volume 29, Page 156 of the Windham Land Records). (Plaintiff's Ex. 1).
Plaintiff in his complaint alleges the following:
1. That he owns land bordering Frog Pond.
2. That he owns land which borders land under Frog Pond.
3. That his boundary line moves.
4. That the movement of the boundary line is based upon accretion and avulsion.
Paragraph 3 of the Plaintiff's Complaint, dated October 9, 1997, alleges: "The plaintiffs property at 238 Scotland Road, Windham, Connecticut, directly abuts the shore of a body of water known as Windham Frog Pond, also known as Frog Pond in said Town of Windham, CT Page 9034 Connecticut."
The deed by which the plaintiff obtained title (which conveys two "pieces", the first of which is relevant to this case) dated January 14, 1987, as recorded in Volume 296, Page 177 of the Windham Land Records, sets forth a description as follows:
 FIRST PIECE — located about one mile easterly from Windham Green on the northerly side of the highway leading from Windham to Scotland and is bounded on the south by said highway, on the west by land covered by Windham Frog Pond, on the north by land now or formerly of Frank Tingley and on the east by the Second Piece hereinafter described. (Emphasis added.) (Plaintiff's Ex. 1).
Therefore, the deed does not state that the property "directly abuts the shore of a body of water known as Windham Frog Pond," but rather, states that the property is bounded "on the west by land covered by Windham Frog Pond."
There was a time when the two parcels, Frog Pond and the property owned by the plaintiff, were part of a single larger tract owned by a single owner. This larger tract is described in a deed from Alice Hibbard to Abraham Hill, dated November 7, 1749, and recorded in Volume 1, Page 313 of the Windham Land Records. (Defendant's Ex. 1). The next conveyance is the first time that the boundary separating the property of the plaintiff and the property of the defendants was delineated. The description of that boundary is set forth in a deed from Abraham Hill to Benjamin Follet, dated April 3, 1750, and recorded in Volume 1, Page 428 of the Windham Land Records reads as follows:
 "one certain piece of land lying and being in the Township of Windham above said and is part of the land which I now dwell which I bought of Alice Hibbard of Windham and that part of my land which is under water apart of the above named Follet's mill pond and so much land as said pond shall cover when the dam of said pond shall be mended up even with the rest of said dam as it were before the late break was made in aforesaid dam; aforesaid land butts or followeth; southerly on the aforesaid mill dam and westerly; on the aforesaid mill brook running northward on aforesaid brook untill it comes to the land formerly CT Page 9035 called Hibbard's 4 acre meadow; thence abutting northerly on aforesaid 4 acre meadow land untill it comes to the aforesaid mill by high water mark wherein water used to come when the dam was whole; and running southerly untill it comes to the highway which leads from the first society in aforesaid Windham unto the third society in Windham"
(Emphasis added.) (Defendant's Ex. 1).
This description delineates Benjamin Follet's boundary. It delineates Abraham Hill's boundary to the property which is now owned by the plaintiff. This is what Abraham Hill had left after the conveyance, part of which the plaintiff now occupies. In selling off this parcel, Abraham Hill did not fix his remaining boundary as the waters of Frog Pond, or the land under Frog Pond, but at a fixed line, namely, the dam high water mark when the dam was whole.
At trial the defendant's trial expert, J. Roger Hanlon, Esq., testified that: "The plain interpretation of the deed is that the dam was down, and the intent was to convey land that went beyond the level, wherever it was, of the water remaining in the pond." (T. May 11, p. 102).
Mr. Hanlon further testified that: "[T]he boundary as described is about as accurate and defined a boundary line as you could get because essentially what it does is to take a plane, which would be the surface of the water at its highest level behind a rebuilt dam, and it have that plane intersect the landscape within the remaining land of [H]ill. That defines a line which is very precise which would probably be difficult for a surveyor to duplicate, but it makes it very clear that there is a very well defined line. Probably much more well defined than usual boundary lines would be at that time." (T. May 11, pp. 102-103).
Abraham Hill, after the conveyance, owned the land now owned by the plaintiff. Abraham Hill, the owner of the land now owned by the plaintiff, did not reserve any rights for himself in the use of the pond or in the use of the waters of the pond. Abraham Hill did not reserve an easement or other rights to the pond. At the time of that conveyance it was clear that he was conveying around the perimeter of the pond if it was recreated. There was no obligation to create the pond and, therefore, and at the time of the conveyance, the water did not touch the land that he retained. (T, May 11, pp. 104-105).
There is no indication in language used by Abraham Hill that if he wanted to have riparian rights in the water when the dam was mended, that he reserved that right. CT Page 9036
The next conveyance out from Abraham Hill is described in a deed to John Hill, dated February 17, 1758, and recorded in Volume I, Page 117 of the Windham Land Records. (Plaintiff's Ex. 1). The second conveyance, the deed to the land which is now owned by the plaintiff, contained a less precise boundary line. However, since it was the second transfer he could only convey what he had.
All that Abraham Hill could convey was up to the boundary line that he himself had created in the first conveyance, the conveyance to Benjamin Follet. "It is the high water mark of the pond when the dam is mended and the water reaches the top of the dam." (Defendant's Expert) (T. May 22, pp. 105-106).
"When determining a boundary line in a deed, if the description in the deed is clear and unambiguous, it must be given effect. In such a case, the inquiry is not the intent of the parties but the intent that is expressed in the deed.... The construction of a deed in order to ascertain the intent expressed.. .presents a question of law and requires consideration of all its relevant provisions in the light of the surrounding circumstances." (Citation omitted.) McCullough v. WaterfrontPark Assn., Inc., 32 Conn. App. 746, 630 A.2d 1372, cert. denied,227 Conn. 933, 632, A.2d 707 (1993).
The original boundary line between the parties was clear and unambiguous, requiring no inquiry into the intent of the parties. Abraham Hill did not reserve water rights for himself in the property which is now owned by the plaintiff. He did not condition the conveyance to Benjamin Follet on the promise that Follet would refill the pond, bringing the water to Abraham Hill's boundary. The first deed out from Abraham Hill clearly and unambiguously contains no such rights or obligations. Abraham Hill was certainly in a position to reserve a right to the water or to acquire restoration of the dam when he sold the land to Benjamin Follet as set forth in the deed dated April 3, 1750, and recorded in Volume I, Page 428 of the Windham Land Records.
Referring to the two conveyances out from Abraham Hill, the first to Benjamin Follet, and to John Hill, without knowing that the conveyance to Benjamin Follet preceded the conveyance to John Hill, then the boundary line might seem ambiguous. The first deed describes the boundary as the high water mark when the dam shall be mended up, while the second deed describes the boundary as lying on the east side and next adjoining to Follet's mill pond. However, Abraham Hill could only convey out in the second deed, the 1758 deed to John Hill, what he had left. He could not convey out more than he had retained, and all that he retained was up to the dam high water mark, and not to the waters of the pond, nor to land CT Page 9037 covered by the pond. He retained land only up to the dam high water mark, where the waters would reach if and when the dam were mended up and the water filled to the maximum point.
There is every indication that the water was filled back up to the dam high water mark at the time of the second conveyance dated February 17, 1758, and recorded in Volume 1, Page 117. This is the only circumstance in which such a legal description would be accurate. (T. May 11, p. 111). Furthermore, this description (on the east side of Follet's mill pond), is used in several subsequent deeds.
There is no evidence that the pond was filled to the high water mark at the time of the conveyances prior to 1896. However, the next deed in the chain of title categorically illustrates that this Grantor was aware that her boundary line was not the waters of Frog Pond at that time. In a deed from Sarah P. Tingley to Frank Wilcox, dated September 21, 1896, and recorded in Volume 68, Page 154 of the Windham Land Records; (Plaintiff's Ex. 1); she describes the boundary as: "Westerly by land late covered by the Windham Frog Pond."
There can be no doubt from the clear unambiguous reading of this deed that Sarah Tingley knew that her boundary was westerly by land that used to be covered by Windham Frog Pond. After so many prior conveyances which stated the boundary was "westerly by Windham Frog Pond," it is clear that as late as 1896, that if the water level was down from the high water mark, the boundary was not the pond, but the place where the water used to be, or would go, when and if the level of the pond was raised.
The subsequent deeds introduce a new legal description in the plaintiff's chain of title; e.g., on the west by land covered by Windham Frog Pond."
Notwithstanding the more recent descriptions in the plaintiff's chain of title, the only time that such a description would be accurate would be when the water level was raised to the high water mark. This court finds that from at least 1937 the pond has not been raised to the dam high water mark, and the property which is now owned by the plaintiff bordered not on a pond, but on dry land, just as it did when it was conveyed by Sarah P. Tingley to Frank Wilcox on September 21, 1896, as set forth in Volume 68, Page 154, and just as it was when Abraham Hill sold off the first piece to Benjamin Follet in 1750 and retained the property now owned by the plaintiff.
There is no evidence that water rights somehow were acquired by the plaintiff in his chain of title. There were no water rights conveyed from anyone in the defendant's chain of title to anyone in the plaintiffs CT Page 9038 chain of title. Certain water rights are set forth in the plaintiff's chain of title, but they have nothing to do with this pond. For example, in the plaintiff's chain of title, there is a deed from William L. Webster to Julia A. Tibbits, dated April 1, 1876, and recorded in Volume 50, Page 420 of the Windham Land Records, which includes "the privilege of water from the aqueduct." This same right is conveyed in several following deeds in the chain of title. However, any reference to water rights refers to some other property that has no relationship whatsoever to any claimed riparian rights in the Frog Pond.
The facts disclose that the pond in question is an artificial pond completely on the land owned and controlled by the defendants.
The facts indicate that the pond was created in 1749 on property conveyed to the defendant's predecessors in title. The property line is defined as the high water mark of the pond.
Although for all practical purposes, Connecticut Courts have found that property lines defined as high water mark are as a matter of law the shore of the watercourse the property abuts; see McCullough v. Waterfront ParkAssn., Inc., supra 32 Conn. App. 751; this rule applies to naturally occurring and nonnavigable waterways.
This legal conclusion is important because it is well settled that the right to access is distinct from any general right of the public and the fundamental riparian right upon which all others depend. See McGibney v.Waucoma Yacht Club, Inc., 149 Conn. 560, 563, 182 A.2d 622 (1962);Rochester v. Barney, 117 Conn. 462, 469, 169 A. 45 (1933).
Abraham Hill, the plaintiff's predecessors in title conveyed to the grantee of the pond area, Benjamin Follet. "...that part of my land which is under water a part of the above Follet's mill pond and so much land as said pond shall cover when the dam of said pond shall be mended up even with the rest of said dam as it was before the late break was made in aforesaid dam."
The primary issue is whether the grant of land or the land retained by the grantor contemplated by its terms the waters edge. The parties are in agreement that the defendant owns all of the land under Frog Pond.
The defendant maintains that because the conveyance out of his title predecessor to the waters edge high water mark of the land beneath the pond, the plaintiff is thereby cut off from any riparian or littoral rights because he has no subaqueous land or easement to allow use of the water atop the subaqueous land. CT Page 9039
The first issue which the court must address is what rights does the plaintiff have in the lake, under the allegations of the complaint and the evidence presented at trial.
In the complaint, plaintiff has not set forth the basis of his claimed status as riparian owner. There is no allegation as to how he acquired his claimed rights, whether by deed, by easement express or implied, or by adverse possession and no evidence was presented on this point.
The only allegation which bears on this point is the claim that they he owns land abutting the lake.
As the review of the chain of title has demonstrated, the deeds by which the plaintiff acquired title to the abutting properties contain no specific mention of any right in the lake. If the plaintiff claims he has acquired riparian rights by virtue of his title to the lot abutting the lake, such lack of specific grant is significant. See Kennedy v. Scovil,12 Conn. 317 (1837).
Although plaintiff has framed his complaint in terms of "riparian" rights it has been conceded that the right of an owner of land abutting a lake or pond is more properly termed a "littoral" right. See Chamberlainv. Hemingway, 63 Conn. 1, 27 A. 239 (1893). Since the terms have been used interchangeably however, and since there appears to be no substantive difference between them, the term "riparian" will be used herein. See Chamberlain. v. Hemingway, supra; 63 Conn. 1. See generally Robert I. Reis, UCONN INST. WATER RESOURCES CONNECTICUT WATER LAW: JUDICIAL ALLOCATION OF WATER RESOURCES R.4 (1967).
Riparian rights are not an easement in the water or an appurtenance to the land. Rather they constitute a property right which is inseparably annexed to the ownership of land adjoining a watercourse. See Buddingtonv. Bradley, 10 Conn. 213, 218 (1834); Wadsworth v. Tillotson, 15 Conn. 366,372 (1843).
Such rights are usufructuary in the water and entitles the owners of the land to which they are annexed to make use of the water for the ordinary purposes of domestic life, the watering of animals, bathing, boating and general recreational uses. See Harvey Realty v. Borough ofWallingford, 111 Conn. 352, 359-61, 150 A. 60 (1930).
The Supreme Court in the Harvey case, at page 358, defined a riparian proprietor as being the owner of land bounded by a watercourse or lake through which a stream flows and the Court added that such right could be claimed only by such an owner. CT Page 9040
Title to the land under the stream is an important incident of riparian ownership. When land is owned on both sides of a nonnavigable watercourse the riparian proprietor owns the entire bed for the full length of his property. If the riparian proprietor owns only on one side of the watercourse, he holds title to the subaqueous lands to the center of the stream and no further. See Parker v. Griswold, 17 Conn. 288 (1845); Reis, supra, p. 35.
In the case at bar, plaintiff has not claimed title to any subaqueous land and the evidence indicates that he holds title only to the lot bounding on land to the high water mark on Frog Pond.
The Supreme Court of Pennsylvania considered the rights of persons owning land abutting the lake, or pond, where title to the subaqueous lands are in another in Miller v. Lutheran Conference and Camp Assn.,331 Pa. 241, 200 A. 646, 649-50 (1938) and stated the rule as follows:
 "Ordinarily, title to land bordering on a navigable stream extends to low water mark subject to the rights of the public to navigation and fishery between high and low water, and in the case of land abutting on creeks and non-navigable rivers to the middle of the stream, but in the case of a non-navigable lake or pond where the land under the water is owned by others, no riparian rights attach to the property bordering on the water, and an attempt to exercise any such rights by invading the water is as much a trespass as if an unauthorized entry were made upon the dry land of another."
See also Camp Clearwater, Inc. v. Plock, 52 N.J. Super.Ct.Ch.Div. 583, 146 A.2d 527, 538 (1958); aff'd, 59 N.J. Super. 1, 157 A.2d 15
(1959), cert. denied, 32 N.J. 348, 160 A.2d 846 (1960). Shaffer v.Baylor's Lake Assn., 392 Pa. 493, 141 A.2d 583, 585 (1958).
In Glaskie v. LaLancette, 91 R.I. 317, 163 A.2d 325, 329, cert. denied, 364 U.S. 919, 81 S.Ct. 285, 5 L.Ed.2d 260 (1960), the Supreme Court of Rhode Island addressed the same issue and stated the rule as follows:
 "When the owner of land on the banks of a stream by the exercise of a right of flowage created an artificial pond upon his land the right to use the water thus stored is CT Page 9041 exclusively in such owner and the proprietors of land bordering on such artificial pond do not acquire any right in the water therein upon the ground that by flowage the shores of the pond have been brought to their land."
The Connecticut Supreme Court has addressed the problem involving the rights of parties owning land abutting lands of others which have been flooded in several cases.
In Turner v. Selectmen of Hebron, 61 Conn. 175, 188, 22 A. 951 (1891), the Court held that the right to take fish from a pond belongs to the owner of the soil over which the water flows because ownership of the soil carries with it ownership of the water.[1]
In Great Hill Lake, Inc. v. Caswell, 126 Conn. 364, 367, 11 A.2d 396
(1940) where the abutting owner held title to most of the land over which plaintiff had a right of flowage the Court refused to restrict such owner's right to use the water for recreational purposes except for that portion of the lake where plaintiff held title to the bottom.
In Schroder v. Battistoni, 151 Conn. 458, 199 A.2d 10 (1964) where the abutting owners sought to restrain the owner of the subaqueous land from removing their docks which extended into the lake, the Supreme Court overturned the trial court's judgment in favor of the plaintiff since there was no basis for finding that the abutting owners had any implied easement to maintain such docks. The Court recognized the subaqueous owner's right to remove the docks to the water's edge. See id.
The Court considered the distinction between a controversy between the owner of land subject to an easement of flowage and the owner of the easement with a dispute between different owners of subaqueous land underneath a pond and stated: "As to any flowed land which he owned absolutely, he may well have exclusive rights of boating, swimming and fishing." Gager v. Carlson, supra, 146 Conn. 295-96.
This court has also examined the decision of the Supreme Court inLabbadia v. Bailey, 152 Conn. 187, 205 A.2d 377 (1964) and the predecessor cases. See e.g., Labbadia v. Bailey, 147 Conn. 82, 157 A.2d 237
(1959); as regards the rights or littoral or riparian rights insofar the facts in those cases.
The Court in the earlier Labbadia case found that a nonparty, the Noyes School Corporation, held title to adjoining land of the plaintiff and held title to adjoining land under the waters of the lake over which the dam owner had only flowage rights. See Labbadia v. Bailey, supra,147 Conn. 82. Thus the Noyes School was found to be a littoral or CT Page 9042 riparian owner and under the rule in the previous-mentioned case law had a right to make reasonable use of the lake at least over its own subaqueous land. See id.
Plaintiff here has no basis to claim an interest in land beyond a point on the land of the defendant that would be the high water mark of the pond.
For an exhaustive analysis of the issues presented in a matter on all points with the subject of the controversy here, see Lake Williams BeachAssn. v. Gilman Bros. Co., Superior Court, Judicial District of New London, Docket No. 065159 (December 29, 1982, Purtill, J.), 197 Conn. 134,496 A.2d 182 (1985).
From analysis of all the evidence presented and after review of the above considered case law, the court must conclude that plaintiff has failed to prove the essential allegations of the complaint that he is a riparian owner with usufructuary rights in the waters of Frog Pond.
Accordingly, the court finds for the defendant on the complaint and for the defendant on the defendant's counterclaim, but finds no evidence of specific damages proved by defendant.
The court hereby dissolves the temporary injunction granted by previous proceedings against the defendant. On the defendant's counterclaim, the plaintiff is hereby enjoined from any use or entry upon said Frog Pond without the defendant owner's permission.
In light of the overall ambiguity of the original status of rights of the parties[2] and the necessity to require proof dating to the beginning of the eighteenth century, the court in the exercise of its equitable power, awards no cost or allowances or attorney's fees to either party.
 ___________________________ Kocay, J.